No. 32,099

THE STATE OF KANSAS, *Appellee,* v. JOHN LINTNER (alias J. V. LINT-
NER), *Appellant.*

(41 P. 2d 1036)

Opinion filed
March 9, 1935.

*Owen S. Samuel,* of Emporia, *G. R. Gard* and *Stanley E. Toland,* both of
Iola, for the appellant.

*Clarence V. Beck,* attorney-general, *Earl B. Swarner,* assistant attorney-
general, and *Merle Loughridge,* county attorney, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: In this case the defendant was prosecuted for
selling capital stock in a bank when it was in a failing condition,
using false pretenses and representations with intent to defraud F.
F. Schainost.

It was alleged that on May 21, 1931, the defendant unlawfully,
feloniously and falsely represented to Schainost, with intent to cheat
and defraud him, that defendant was looking after the settlement of
his father's estate; that the estate was possessed of sixteen shares in
the First National Bank of Colony; that to settle the estate it would
be necessary to sell the sixteen shares of stock, and that on May 21,
1931, the shares of stock in the bank were in book value $135, and
reasonably worth $150 a share. The information charged these

statements were false and fraudulent in the following particulars: That on May 21, 1931, the bank was in a failing and insolvent condition, and was known by the defendant to be in a failing and insolvent condition; that on that date the estate of the defendant's father possessed only one share of stock in the bank, instead of sixteen; that said defendant cashier was the managing officer of the bank and knew that the shares of stock of the defendant's father had been transferred and distributed; that Schainost believed the false representations to be true and, being deceived thereby, was induced by the false representations to pay for two shares of stock in the bank. This information charged the making of representations which led Schainost to purchase, and that this was done with the intent to cheat and defraud him.

The information is substantially like that in *State v. Palmer*, 40 Kan. 474; 20 Pac. 270, and the information in that case was held to be adequate and sufficient in that it set out the pretenses by which the fraud was consummated, the value of the property obtained and alleged the fraudulent intent. It is said that the false representations should have been negatived specifically. The truthfulness of defendant's representation that the estate belonging to his father was possessed of sixteen shares of stock in the bank is properly negatived by the allegation, "when in truth and in fact said statements were false and fraudulent"; and the allegation that Lintner's father at the time possessed but one share of stock, and that the defendant was cashier and managing officer of the bank, and knew to whom the shares of stock belonged and knew that the shares in question belonging to the estate had theretofore been distributed to the members of his family.

The information alleged the pretense of the defendant as to the book value of the stock being $135 and reasonably worth $150 a share. This pretense of the defendant is sufficiently negatived by the allegation that said statements were false and fraudulent and that the bank was then and there in a failing condition and known by J. V. Lintner to be in a failing condition. The book value of the stock depends largely on the solvency of the corporation, and by setting up the fact that the bank was failing and insolvent sufficiently negatives the truth of the defendant's pretense that the stock had a book value of $135 and was reasonably worth $150 a share.

In our opinion the charge in the information was sufficient according to the authorities. (*State v. Palmer*, supra; *Griggs v.*

*United States,* 158 Fed. 572.)  In May, from the third to the fifth, an examiner from the office of the comptroller of the currency was present and made an examination and found the stock to have been impaired, and an order to make up the deficiency was made.  This is done by calling a meeting of the stockholders and making an assessment *pro rata* of the amount of the stock held by each stockholder.

"If any such association shall fail to pay up its capital stock and shall refuse to go into liquidation as provided by law, for three months after receiving notice from the comptroller, a receiver may be·appointed to close up the business of the association." (R. S'. § 5205, U. S. C. A. title 12, § 55.)

No meeting of stockholders to make an assessment was held, and evidently no removal of the impairment was made, but the stock was sold on May 21, 1931.  The representation that the father of the defendant owned sixteen shares when as a matter of fact he only held one share was a false pretense evidently made with intent to defraud.  This, the defendant, who was cashier and general manager of the bank, necessarily knew.  The father evidently was a man of means and the pretense aided in inducing the purchaser to believe that the bank was sound and that the stock was worth the money asked for it.  He was told by the defendant that the bank examiner had pronounced it in good condition financially, when in fact a report of the comptroller was on file in the bank holding the stock was impaired.  These statements having induced the belief in the mind of the purchaser that the bank was sound, he ventured to buy the two shares of stock for which he paid $300 in money.

It has been held that the decision of the comptroller of an impairment is binding upon the stockholders.  In *Thomas v. Gilbert,* 55 Ore. 14, it was said:

"The decision of the comptroller of the currency that the capital stock of a national bank is impaired is conclusive on the stockholders of the bank and on the courts; the bank having no alternative but to make good the impairment or liquidate." (Syl. ¶ 3.)

It devolves on the stockholders to make the findings of impairment and the assessments so that the bank can continue in business.  This was not done, and the impairment of the capital was not removed. It continued impaired so long as the bank continued in business.  Efforts were evidently made to restore the capital, but it was not effected and the defendant admitted that from the time the notice of the comptroller was received in April the impairment of the capital

continued until the bank finally closed. The defendant testified that they were continuously in difficulty, working from one thing to another until finally the bank had to close.

It has been held that the book value of corporate stock is the net worth of all corporate assets less all liabilities of the corporation. (*Gurley v. Woodbury,* 177 N. C. 70.) This case is cited in an annotation to *Early v. Moor,* 33 A. L. R. 366. As far as the defendant is concerned, the purchaser, Schainost, was led to part with money by false pretenses and defendant must be regarded as guilty of an offense. In the case of *Musgrave v. The State,* 133 Ind. 297, it was said:

"If the false pretenses of the wrongdoer are such as to deprive the person from whom the money is procured of his money, then money is obtained by false pretenses, and a crime is committed. If, in other words, the wrongdoer does make such false pretenses as induces another to part with his money or property, that money or property is obtained from the owner by false pretenses, because he is deprived of it by criminal means and methods. The law does not make it an element of the offense of obtaining money or property under false pretenses that it shall be obtained for the person making the pretenses himself, or that it shall be intended to obtain it for another, for it is provided that 'whoever shall obtain money or property' by false pretenses shall be guilty of a felony." (p. 307.)

We have noted that in *In re Snyder,* 17 Kan. 542, it was said:

"It is not necessary, to constitute the offense of obtaining goods by false pretenses, that the owner should have been induced to part with his property solely and entirely by pretenses which were false; nor need the pretenses be the paramount cause of the delivery. It is sufficient, if they are a part of the moving cause, and without them the prosecutor would not have parted with the property." (p. 555.)

The evidence sufficiently establishes the finding of the defendant's guilt.

There are criticisms of the instructions brought to our attention, for instance, the sixth instruction, which provides:

"In connection with this same matter I have to advise you that a person who has something to sell may lawfully represent it as he believes it to be, however mistaken he may be in such belief; however, he is not warranted in making representations as to value which he expects the other party to rely on without some knowledge of the situation, and if he does it improvidently and without investigation or such knowledge of the affair as he was capable of ascertaining from means under his control he may not thereby escape from the effect of such representations, but must answer for the same accordingly. So, if you believe that Lintner, without sufficient examination and research into the facts and without the use of such information as he may have had

at his command, represented to Schainost a state of affairs that was not warranted by the facts then I think you would be justified in finding that Lintner made a false representation in spite of the fact he may have done so inadvertently, providing always that such representations were made by Lintner with the intent to deceive Schainost and consequently cheat and defraud him."

It is contended that the latter part of the instruction is erroneous wherein the court says:

"So, if you believe that Lintner, without sufficient examination and research into the facts and without the use of such information as he may have had at his command, represented to Schainost a state of affairs that was not warranted by the facts, then I think you would be justified in finding that Lintner made a false representation in spite of the fact he may have done so inadvertently, providing always that such representations were made by Lintner with the intent to deceive Schainost and consequently cheat and defraud him."

This seems to be favorable to defendant. He could not shut his eyes to information in his bank and falsely represent a fact with the intention to defraud and cheat Schainost and consequently to defraud him. In that event he is chargeable. .

Some complaint is made of instruction seven, but it also is favorable to the defendant. It simply points out that the fact the bank may have closed its doors in August, 1931, would not be sufficient to warrant the conclusion that a false representation was made by Lintner in the negotiations which led up to the deal on May 21, but such fact is an incident which may very properly be taken into consideration with other testimony.

What could happen in the few days which existed between May 5 and May 21 of the same month? The other testimony reveals the fact that no steps were taken, but evidently defendant was looking towards a patching up of the capital which he was unable to accomplish.

There is a claim that an instruction was requested by defendant to the effect that the state's evidence of other transactions similar to the one involved is to be considered only for the purpose of showing the intent, method and means of business or knowledge of the defendant, and that such evidence is to be considered for no other purpose. The court appears to have given, some attention to the subject where it said in the eighth instruction:

"There is some evidence before you gentlemen in regard to the opinion of witnesses as to the solvency of the First National Bank of Colony, and of the result of examinations thereof and consequent report thereof. This evidence·

would not bind the defendant except as to matters which were communicated to him, and the effect of giving the information to him, if it was given, would be simply to charge him with knowledge of what such witnesses thought the financial state of the bank to be."

The instruction said to have been asked, it appears, is not in the record. It does not appear in the files of the case. In order that this instruction shall be considered it is necessary that it be filed in compliance with R. S. 60-2942. It is not filed with the clerk, was not requested in open court and does not appear as a part of the transcript of the proceedings of the case taken by the court reporter, and it therefore cannot be brought before us for review. It was held that:

"Error cannot be predicated on the omission of the trial court to give fuller instructions when the omission is first called to the attention of the trial court after verdict by a motion for a new trial; and such omission is not a proper ground for a motion in arrest of judgment." (*State v. Clough,* 70 Kan. 510, 79 Pac. 117, syl. ¶ 2.)

See *State v. Winters,* 81 Kan. 414, 105 Pac. 516, where the subject is more fully treated and is well supported by other authorities. The motion, if made, has not been inserted in the record and is not effective. Cases must be tried on the record made.

The judgment is affirmed.

HARVEY, J. (dissenting): I have difficulty finding sufficient evidence in this case to sustain the verdict; but I shall pass that point without reviewing the evidence, for another reason in my judgment requires reversal. Evidence was received from several witnesses to whom appellant sold or attempted to sell shares of stock of the bank, as to representations he made to them. This evidence was competent only for the purpose of showing motive, etc., and the court should have so limited it. (See *State v. Robinson,* 125 Kan. 365, 263 Pac. 1081, and allied cases.) The record does not disclose that was done at any time. Counsel for appellant contend the court was orally requested to so instruct the jury. The record does not show the request, and attorneys for the state who present the case here did not participate in the trial, hence must depend upon the record. While appellant's counsel should have seen that a record was made of the request, it was the duty of the court to give the instruction without a request. The statute (R. S. 62-1447) provides the trial judge in charging the jury "must state to them all matters of law which are

necessary for their information in giving their verdict." I know of no "matter of law" more necessary for the information of the jury than the limited purpose for which evidence is received of offenses other than the one charged in the information. Such evidence is dangerous at the best; it should be received with caution, and its sole purpose should be made clear to the jury when it is received, and our statute requires the court to inform the jury of its purpose by an instruction. This was not done. The lack of such instruction cannot be said to be without prejudice, especially in a case such as we have here when the evidence taken at its best is barely sufficient to sustain the verdict.

SMITH, J., concurs in this dissent.