No. 45,071

STATE OF KANSAS, *Appellee and Cross-Appellant,* v. ELMER G. PAXTON, *Appellant and Cross-Appellee.*

(440 P. 2d 650)

Opinion filed May 11, 1968.

*Raymond L. Spring,* of Topeka, argued the cause, and *Dale H. Corley, Lelyn J. Braun* and *Patrick J. Regan,* of Garden City, and *Richard D. Greene,* of Denver, Colorado, were with him on the brief for the appellant and cross-appellee.

*Daniel D. Metz,* assistant attorney general, argued the cause, and *Robert C. Londerholm,* attorney general, and *John S. Elting,* county attorney, were with him on the brief for the appellee and cross-appellant.

The opinion of the court was delivered by

O'CONNOR, J.: This is an appeal by the defendant, Elmer G. Paxton, who was convicted by a jury of the crime of obtaining money by false pretenses, in violation of G. S. 1949 [now K. S. A.] 21-551. The basic questions presented by the defendant are: (1) Alleged trial errors which he contends denied him a fair trial by an impartial jury; (2) the sufficiency of evidence to sustain the conviction. A third question, which is the basis of a cross-appeal by the state, is whether or not a prior court-martial conviction may be used to invoke the provisions of the habitual criminal act.

Early in December 1962, the defendant, R. V. Woodard and Richard Ulmer met at Woodard's home in Anthony, Kansas. Woodard had been in the termite control business for nearly twenty years. An agreement was reached to recheck the houses of Woodard's former customers for termites and ascertain if any other services could be rendered. It was further agreed that all checks received in payment for any services were to be made to Ulmer, who would cash the checks and receive twenty percent thereof for his part in the operation. The balance, after payment of expenses, was to be divided equally between the defendant and Woodard. The purpose of Ulmer's acting as the "check man" was that if any trouble developed, his fine could be paid by the other men, and thus, embarrassment to Woodard's company be avoided.

Thereafter, the three men, along with Richard Barker and two others, left Anthony, taking with them Woodard's car and truck. After stops in several towns and communities the group arrived at Dighton, Kansas, on December 12, 1962, where, at defendant's suggestion, they called on C. W. Monroe. Defendant knew Mr. Monroe to be an elderly person, having tried to sell him a termite job a year or so before. Also, Mr. Monroe had had his residence treated for termites by the Woodard company in 1960, with renewal contracts and annual inspections in 1961 and 1962. About 1:30 p. m. defendant and Barker went to the door and introduced themselves

to Mr. Monroe as being with the Woodard company. The two men informed Mr. Monroe they were inspecting for termites and wood rot. Defendant went to one corner of the house and jumped up and down, the floor "gave a little," and Mr. Monroe was told it likely needed bracing. The men asked if they could inspect under the house. After receiving permission to do so, Barker made the inspection and returned with some decayed wood in his hand. Barker showed Mr. Monroe the wood and told him there was wood rot in the floor joists. Woodard was then called in from the car, and he showed Mr. Monroe some wood rot on a window casing of the house. Mr. Monroe was informed his house could be treated with a chemical called "penta" (pentachlorophenol) which would permanently take care of the wood rot. After Mr. Monroe agreed to the treatment, the men left. Shortly, two other men in a pickup truck arrived and sprayed fluid underneath the house for approximately forty-five minutes or an hour. Later in the afternoon the defendant returned to the Monroe home with Ulmer, whom defendant introduced as the "chemical man" and the person handling the collections. Defendant did most of the talking. Mr. Monroe was told the treatment had been completed, that it was very expensive, and that 170 gallons of the chemical, at $6.80 per gallon, had been used. Mr. Monroe was directed to make a check for $1,156 to Ulmer. At defendant's request, Mr. Monroe called his bank and authorized payment of the check, whereupon the men left. Ulmer cashed the check that same afternoon, and the men gathered at a cafe in Dighton. In the ensuing conversation Barker expressed the thought that they could have obtained more money for the job, and defendant suggested they go back and attempt to get more money from Mr. Monroe. Woodard vetoed the idea. Twenty percent of the money was paid to Ulmer, the expenses were paid, and the balance was divided between Woodard and the defendant.

Defendant's trial which resulted in his conviction took place in Lane county in April 1967. His first trial occurred three months previously and ended with a hung jury. Barker was tried and convicted in December 1964 in the same county for his part in the transaction.

We shall first direct our attention to numerous trial errors which defendant contends denied him a fair trial by an impartial jury. It should be mentioned that the points raised were set forth as grounds in defendant's motion for new trial which was denied by the trial court. We note the thrust of defendant's argument to be

that when all of the alleged trial errors are considered together, the totality of circumstances surrounding the trial demonstrates a reasonable likelihood that the verdict of the jury was affected by prejudice, citing *Sheppard v. Maxwell*, 384 U. S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507, and *Estes v. Texas*, 381 U. S. 532, 14 L. Ed. 2d 543, 85 S. Ct. 1628. Appellate counsel has done a commendable job of weaving language from those cases into the factual situation here and thus presenting his client's cause in the most favorable light possible. Careful scrutiny, however, of each of the alleged trial errors, singly as well as collectively, will reveal that the taint of prejudice which would warrant reversal has not been made to appear.

Complaint is made that defendant's petition for change of venue, filed pursuant to K. S. A. 62-1318, was not acted on favorably by the trial court. In his petition the defendant alleged that it would be impossible to select a jury in Lane county that could fairly and impartially try the case because of the size of the county and the fact that persons other than the defendant had previously been tried in that county or entered pleas of guilty to the same charge upon which the present information was predicated, and further, that in defendant's first trial it was learned the citizens of the county had general knowledge of the offense and preconceived opinions as to defendant's guilt.

The only evidence offered by the defendant in support of his petition was the affidavit of his trial counsel, Lelyn J. Braun. In his affidavit Mr. Braun referred to the examination of prospective jurors in the first trial to the effect they had preconceived opinions about defendant's guilt, and then recounted what one or more of the jurors told him concerning their deliberations in the jury room. No counter affidavits were offered by the state. The trial judge, in denying the petition, observed that the attorney's affidavit was hearsay and otherwise improper, and further noted that in the previous trial twenty-four jurors had been qualified without difficulty from a panel of less than forty persons originally called. No complaint is now made about the court's refusal to consider Mr. Braun's affidavit. When the petition for change of venue was presented to the district court, some reference was made to evidence submitted at the first trial where a similar petition had been presented and denied. None of that evidence, however, has been abstracted for our benefit.

We need devote little time to the principles of law governing

an application for a change of venue in a criminal prosecution. Our cases quite generally hold that specific facts and circumstances showing prejudice must be proved to the satisfaction of the trial court (*State v. Eldridge,* 197 Kan. 694, 421 P. 2d 170, cert. denied 389 U. S. 991, 19 L. Ed. 2d 483, 88 S. Ct. 486, and cases cited therein), and when the trial court's ruling upon this question is supported by competent evidence, such ruling will not be disturbed (*State v. Hooper,* 140 Kan. 481, 37 P. 2d 52; *State v. Miller,* 131 Kan. 36, 289 Pac. 483). Two of our most recent expressions on the subject where the matter was explored in considerable depth are *State v. Poulos,* 196 Kan. 253, 411 P. 2d 694, cert. denied 385 U. S. 827, 17 L. Ed. 2d 64, 87 S. Ct. 63, and *State v. Turner,* 193 Kan. 189, 392 P. 2d 863.

The rule is well established that before a court is justified in sustaining an application for a change of venue on account of prejudice against the defendant by the inhabitants of the county in which the cause is pending, it must affirmatively appear that such prejudice exists as will be reasonably certain to prevent a fair trial. (*State v. Turner,* supra.)

Upon the record before us, we have no difficulty in concluding that defendant failed to present affirmative evidence that such prejudice existed as to make it reasonably certain he could not obtain a fair trial, and consequently, the trial court's ruling will not be disturbed. Moreover, a study of the proceedings leading up to the selection of the jury demonstrates that a trial could be had by a fair and impartial jury.

The population of Lane county numbered 3,077, with approximately 1,200 persons eligible for jury duty. At the *voir dire* examination, out of forty-three prospective jurors examined, nine were excused because of preconceived opinions and one was excused because he had served as a juror in Barker's case. Nine others were excused for various reasons until twenty-four jurors were duly qualified and passed for cause by both sides. Each side thereupon exercised six peremptory challenges. The record fails to disclose any undue difficulty was encountered in obtaining a qualified jury. Each member of the jury finally selected was thoroughly examined. The trial court was abundantly cautious and promptly excused any prospective juror who gave any indication that he had formed a fixed and abiding opinion in the case.

This case is not one where the community was exposed to newspaper, radio or TV coverage prior to or during trial, nor is there

a showing that the case was even mentioned in the local press or the broadcasting media in the area. To attempt to analogize these facts with those in *Sheppard v. Maxwell,* supra, and *Estes v. Texas,* supra, is unthinkable. (See, *State v. Eldridge,* supra.)

Defendant challenged the array of jurors on the basis that women were not included on the panel. As an explanation of their absence, the county clerk testified that since the names of women could not be placed on the jury lists without their consent, township trustees were probably reluctant to ask them to serve. The trial court, in overruling the challenge, observed that there had been women jurors on prior panels and that there had been neither a systematic nor intentional exclusion of women from the jury lists. The ruling of the court must stand, even assuming women were excluded from this particular panel. Neither our state nor federal constitution guarantees the right to trial by jury consisting of both men and women. The defendant, not being a member of the excluded class, is in no position to complain about the absence of women from the panel, there being no showing he has actually been prejudiced thereby. (*State v. Neff,* 169 Kan. 116, 218 P. 2d 248, cert. denied 340 U. S. 866, 95 L. Ed. 632, 71 S. Ct. 90; *State v. Snyder,* 126 Kan. 582, 270 Pac. 590; *Fay v. New York,* 332 U. S. 261, 91 L. Ed. 2043, 67 S. Ct. 1613.)

As part of his "totality of circumstances" argument defendant also claims he was prejudiced by certain events occurring during the examination of three prospective jurors. A brief narration of the proceedings will show the argument is patently unfounded. After excusing John West because he had served as a juror in the Barker case, the trial judge commented, "The same evidence basically would be used in this case." Upon objection by defense counsel, the judge amended his statement to "similar circumstances and facts would be involved and the same complaining witness." Albert Ehmke, during his examination, expressed some reservation about a defendant who failed to testify. After defendant's challenge for cause, the judge asked the juror if he could follow an instruction to the effect that whether or not the defendant took the stand was not to be considered. Ehmke responded that he would, and the challenge was overruled. Defense counsel pursued the matter further, and Ehmke remained steadfast in his denial that failure of the defendant to take the stand would not be a factor in his decision. When Jerel Barnett was examined there was some indication on his part that the fact the defendant was charged was

an indication of guilt and that he would expect the defense to introduce evidence to prove the defendant's innocence. Defendant's subsequent challenge for cause was overruled. The court observed that counsel's questions were unclear, and promptly corrected any misconceptions of the law as expressed by the juror. Barnett assured the court that he would follow an instruction to the effect that defendant was presumed innocent until proved guilty beyond a reasonable doubt. We find nothing in these events, and particularly the remarks and comments of the trial judge, that would indicate bias or prejudice against the defendant, nor can it be said that the remaining jurors were prejudiced by what took place in their presence.

Only Ehmke and Barnett were unsuccessfully challenged for cause by the defendant. In both instances, after the challenges were denied, defense counsel pursued his line of questioning and eventually passed each juror for cause. Barnett was subsequently removed with a peremptory challenge—by which side is not shown in the record. At any rate he did not sit as a juror. On the other hand, Ehmke was not challenged peremptorily and was permitted to remain. Why defendant chose not to exercise one of his peremptory challenges against Ehmke, we are not told. No contention is made that had he used one of his challenges on Ehmke, he would have been forced to accept some other juror objectionable to him whom he had challenged peremptorily. Presumably, defendant used his peremptory challenges, with the possible exception of Barnett, on prospective jurors against whom he voiced no objection during his extensive *voir dire* examination. Under all the circumstances, he is in no position to complain about the trial court's rulings on his challenges for cause against Ehmke or Barnett. (*State v. Hoy,* 199 Kan. 340, 430 P. 2d 275; *State v. Springer,* 172 Kan. 239, 239 P. 2d 944; *State v. Hooper,* supra; *State v. Tucker,* 137 Kan. 84, 19 P. 2d 436.)

During the *voir dire* examination it developed that the wife of one of the prospective jurors, Floyd Fuller, was a first cousin of the wife of C. W. Monroe, the complaining witness. Defendant now claims his conviction is vitiated because Fuller was related to the injured party and thus was an incompetent juror. (K. S. A. 62-1406.) The point requires no discussion on its merits, for the simple reason that the juror was never challenged for cause. Notwithstanding the relationship was discovered early in the examination, no objection was made until defendant's motion for a new trial. Ordinarily, a

question touching upon a juror's qualifications, if not raised until after the verdict is rendered, comes too late and is not available for the purpose of the defendant's obtaining a new trial. (*State v. Wainwright*, 190 Kan. 619, 376 P. 2d 829; *State v. McCombs*, 163 Kan. 225, 181 P. 2d 473.) K. S. A. 62-1410 requires that all challenges for cause be made before the jury is sworn, except where the cause for challenge is not discovered until after the jury is sworn and before the introduction of evidence. When a party, knowing at the time of impanelling the jury that a juror is incompetent, fails to challenge for cause, he waives any right to make complaint upon that ground thereafter. (*State v. Hilbish*, 126 Kan. 282, 267 Pac. 1109; *State v. Jackson*, 27 Kan. 581.)

Defendant also complains of certain events occurring during the course of the trial which he describes as follows: "The state followed a course of conduct clearly calculated to prejudice the jury against defendant by demonstration of the unsavory character of his associates [Woodard and Ulmer]."

When testifying, Woodard volunteered the information he had gone to the penitentiary shortly after the present Monroe transaction. Woodard was then queried by the state whether his first contract with Mr. Monroe was "a legitimate termite contract." Defendant's objection to the word "legitimate" was overruled by the court. This question came after Mr. Monroe had testified about his contract with Woodard in 1960 and that he had been satisfied with the terms and the treatment he had received under the earlier contract. Further, Mr. Monroe, Ulmer and Woodard had testified about events leading up to and including the treatment of Monroe's house in 1962. The implication that this second contract was not "legitimate" may not have been too far wrong. At least we cannot say it was prejudicial. Objections to subsequent questions relating to the termination of Woodard's license as a termite exterminator and his relationship with the defendant after the Monroe transaction were sustained by the trial court. Any question about the propriety of such interrogation was cured when the line of questioning was withdrawn and the court admonished the jury "to completely disregard anything that may have been said or implied about any dealings that went on subsequent to the dealings with Mr. Monroe." On the direct examination of Ulmer, the state elicited testimony that he had previously been in the penitentiary on a check charge and was presently in the custody of the sheriff of Lane county. Defendant, failing to object to this testimony, is

precluded from now raising the matter for the first time on appeal. (K. S. A. 60-404; *State v. Patterson,* 200 Kan. 176, 434 P. 2d 808; *State v. Donahue,* 197 Kan. 317, 416 P. 2d 287; *State v. Freeman,* 195 Kan. 561, 408 P. 2d 612, cert. denied 384 U. S. 1025, 16 L. Ed. 2d 1030, 86 S. Ct. 1981.)

The defendant also complains he was prejudiced by a comment of the trial judge made at the conclusion of the testimony of Dr. Hart, an expert witness for the defense. While the court's comment was injudicious in nature, it was not prejudicial. Furthermore, the defendant failed to register any objection at the time.

After the trial, defense counsel apparently discovered that an aunt of the juror Ekhme had been a victim in a similar transaction in November 1963. The matter was brought to the attention of the trial court as a ground in defendant's motion for new trial. The state produced an affidavit of the juror that he did not learn of his aunt's experience until after the present trial. There was no connection between the two transactions; none of the same parties was involved. Clearly, this formed no basis for the granting of a new trial.

In light of our discussion of the various trial errors, we must conclude that the defendant has failed to demonstrate he did not receive a fair trial by an impartial jury. The case was vigorously tried by both sides before an experienced trial judge whom the record discloses exercised great care and patience to insure a trial free from prejudicial error. The burden is always upon the defendant to make it affirmatively appear that his substantial rights have been prejudicially affected. That burden has not been sustained in this appeal.

We now turn to defendant's second basic contention, namely, the evidence is insufficient to support the verdict. This matter was presented to the trial court at the conclusion of the state's evidence, again at the conclusion of all the evidence, and finally, in defendant's motion for new trial. It is conceded that the jury was properly instructed concerning the elements of the offense with which defendant was charged in accord with what was stated in *State v. Handke,* 185 Kan. 38, 340 P. 2d 877. Among other things, the jury was told that it must find beyond a reasonable doubt the defendant falsely represented there was wood rot in the floor joists of Monroe's residence and the house had been permanently treated for wood rot, and further, that the defendant knew these representations were not in fact true. At the outset defendant

acknowledges the receipt of money from Mr. Monroe by means of the check made payable to Ulmer. Likewise, he concedes that he is bound by any statements of Barker and Woodard made in his presence to Monroe. (*State v. McCormick,* 57 Kan. 440, 46 Pac. 777.) Defendant's complaint of insufficient evidence is confined to three disputed issues which he claims were not proved by the state: (1) the absence of wood rot in the floor joists, (2) the house was not permanently treated, and (3) that even if the assumption is made that the representations concerning the presence of wood rot and the permanent treatment of the house were false, defendant had no knowledge of their falsity.

The role of this court in considering the sufficiency of evidence to support a verdict was clearly stated in the recent case of *State v. Helm,* 200 Kan. 147, 434 P. 2d 796, where we said:

"In a criminal prosecution it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before a verdict of a jury which has been approved by the trial court may be set aside on appeal on the ground of insufficiency of evidence, it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the trial court. (*State v. Walker,* 198 Kan. 14, 422 P. 2d 565, Syl. ¶ 1; *State v. Shaw,* 195 Kan. 677, 408 P. 2d 650; *State v. Gregory,* 191 Kan. 687, 383 P. 2d 965; and *State v. Ledbetter,* 183 Kan. 302, 327 P. 2d 1039.)

"When considering the sufficiency of circumstantial evidence to sustain a conviction of crime on appeal, the question is not whether the evidence is incompatible with any reasonable hypothesis except guilt. That question was for the jury and the trial court. The function of the appellate court is limited to ascertaining whether there was a basis in the evidence for a reasonable inference of guilt. (*State v. Crosby,* 182 Kan. 677, 324 P. 2d 197, 76 A. L. R. 2d 514, and authorities cited therein at p. 685 of the official report; and *State v. Scoggins,* 199 Kan. 108, 427 P. 2d 603.)" (p. 151.)

Was there sufficient evidence to show the absence of wood rot in the floor joists of the Monroe residence? The state produced testimony by two expert witnesses, Mr. Edmund F. Martinez, district entomologist for the Kansas State Board of Agriculture, and Mr. Dean Garwood, director of the division of entomology for said board. Martinez inspected the house in July 1964 and again in October of that year. Garwood was present and took part in the October inspection. Both witnesses testified they found no evidence of any wood rot underneath any portion of the Monroe residence. They further testified that had there been wood rot in the joists in December 1962 (the date of this offense), evidence of such condition would have been present at the time of their inspection nearly two

years later. Contrary to defendant's argument, the fact that Martinez also observed that a two-by-four section of a floor plate appeared to have been replaced at sometime cannot be regarded as being inconsistent with his prior testimony. When or why the section was replaced was not shown. The defense offered some evidence through Philip Marvin, an expert witness, tending to show that he had found wood rot in an inactive stage at the time of his inspection in January 1967. But we cannot weigh the evidence; that was the jury's province.

Was the evidence sufficient to show the house was not permanently treated? It was clearly established that a proper treatment for wood rot is a spray solution consisting of five percent pentachlorophenol mixed in diesel fuel. After the solution is sprayed on wood the pentachlorophenol leaves crystalline deposits on the surface of the wood which reflect light. As described by Garwood, "It would look as though there were particles of glass on the wood when you shine a light on them; these would reflect the light and you could see them." These characteristics remain present on the surface of treated wood for up to five years or more after application. Both Garwood and Martinez testified their visual inspections did not reveal any crystalline formations which would, in their opinion, denote that the house had in fact been treated with pentachlorophenol. Chemical analyses made of shavings taken from the joists of the house also did not reveal the presence of the chemical. The defense introduced evidence tending to cast some doubt on the reliability of the method used by the state chemist in testing the shavings. Mr. Marvin testified his inspection in 1967 disclosed areas of a "white bloom" substance which could have been "penta" residue. Again the weight and credit to be given this testimony was for the jury.

Was there evidence that defendant had knowledge of the falsity of the representations concerning the presence of wood rot and the treatment applied? Defendant argues he was not under the house, so he had no knowledge of what was there, and likewise, there was no evidence he knew what the treatment was. As a general proposition, knowledge of the falsity of the representations is required to sustain a conviction of obtaining money by false pretenses; but this requirement is not confined to actual knowledge in the true sense. The following discussion is found in Perkins on Criminal Law (1957) at page 262:

"The original English statute included the words 'designedly and knowingly.'

They were omitted from the later legislation in that country; and statutes in some of the states include them while others do not. There seems to be no difference in the result, however, because there is a requirement of 'knowledge' under either type of enactment. The word 'knowledge' is unfortunate in this connection because the actual requirement of the law is not limited to knowledge in the true sense. If the representation is really untrue this part of the requirement is satisfied if it is made by one who *knows* it is untrue, or believes it is untrue, or is quite aware that he has not the slightest notion whether it is true or not."

In *Bank v. Hart*, 82 Kan. 398, 108 Pac. 818, this court stated:

"False representations are actionable when made fraudulently—that is, to induce another to part with his money or property—if believed and acted upon and made with knowledge of their falsity, or when made for such purpose by one who has no knowledge upon the subject but who intends to convey, and does convey, the impression that he does have actual knowledge that they are true, and thereby deceives the other to his injury. . . ." (p. 400.)

Also, see, *State v. Lintner*, 141 Kan. 505, 41 P. 2d 1036.

As we have pointed out, the defendant is bound by the representations of Barker as well as those made by himself and Woodard. There was ample evidence from which it could be inferred that even if defendant lacked actual knowledge of the accuracy of the representations, his intention was to convey the impression they were in fact true and could be believed and acted on by Mr. Monroe. Without going into detail, we also believe there was sufficient direct and circumstantial evidence to show a conspiracy between the defendant and his accomplices who had actual knowledge of the falsity of the representations, thus charging the defendant with the knowledge of his coconspirators. (See, *State v. Borserine*, 184 Kan. 405, 337 P. 2d 697.)

We must conclude that the verdict of the jury is supported by substantial competent evidence proving each of the elements of the offense charged, and the conviction is sustained.

The state has cross-appealed on a reserved question. Before sentencing, records were introduced showing the defendant had been convicted by a general court-martial in Berlin, Germany, on May 6, 1949, of robbery and felonious assault, and was sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for a period of three years. The trial court refused to recognize the conviction for the purpose of sentencing the defendant as a second offender under the habitual criminal statute (K. S. A. 21-107a). We have given this matter thorough consideration and are not impressed with the cases cited from a limited number of

jurisdictions which apparently recognize such convictions for the purpose of imposing an enhanced sentence. Our statute applies when there are former felony convictions committed "in or out of this state." We have held that the statute does not require the foreign conviction to be a felony under the laws of this state; it is sufficient that the offense was a felony as defined by the law of such other state or jurisdiction. (*Tyrell v. State,* 199 Kan. 142, 427 P. 2d 500; *State v. Stiff,* 148 Kan. 224, 80 P. 2d 1089, rehearing 148 Kan. 457, 83 P. 2d 424.) Courts-martial convictions frequently relate to offenses of a strictly military character which have no counterpart in the civil law, such as desertion, willful disobedience of a lawful order of a superior officer, and misbehavior before the enemy. We cannot imagine the legislature contemplated that K. S. A. 21-107a was to be applied to a person previously convicted of an offense peculiar only to the military establishment. On the other hand, were we to say that only those military convictions were to be recognized which would be felonies as defined by the Kansas law, we would, in effect, be adding a requirement to the statute that any foreign conviction be a felony under our law. This we cannot do. We hold that a prior conviction by court-martial may not be used to invoke the provisions of the habitual criminal statute.

The judgment is affirmed both as to the appeal and cross-appeal.