No. 62,774

STATE OF KANSAS, *Appellee*, v. ORMOND WIMBERLY, JR., *Appellant*.

(787 P.2d 729)

Opinion filed March 2, 1990.

*Charles D. Dedmon,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Gene M. Olander,* district attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Ormond Wimberly appeals from a conviction of felony murder grounded upon the underlying felony of aggravated robbery.

The controlling question in this appeal centers upon the relationship of circumstantial evidence, fingerprint evidence, and the sufficiency of the totality of the evidence presented to the jury.

Wimberly contends the record does not contain sufficient evidence to support his conviction. We disagree.

Wimberly also contends that the district court erred in: (1) denying his motion to dismiss following the preliminary hearing; (2) refusing to suppress the evidence of his fingerprints and palm prints because the prints were obtained without his consent; and (3) failing to instruct the jury on circumstantial evidence. We find no basis for error in the trial court's disposition of the issues addressed by these three additional contentions.

Wimberly also questions the use of a prior military conviction as a basis for invoking the Habitual Criminal Act at sentencing. We agree that it was error for the trial court to enhance Wimberly's sentence based upon a military court-martial. The imposition of the second life sentence is vacated.

### Facts

The body of Sarah Woody was found on the morning of June 17, 1981, by the maintenance supervisor of Montgomery Ward in Topeka. A car was parked in the Ward's parking lot, which contained her body lying face down on the rear floorboard.

An autopsy was performed. The deputy coroner testified that Woody had suffered five bullet wounds, one of which was fatal.

He determined that the wounds were caused by a large caliber weapon, consistent with a .38 caliber, which was shot at close range (within one and one-half feet). The time of death was estimated between 3:30 and 9:30 p.m. on June 16, 1981.

The State presented a number of witnesses who testified that Woody's vehicle had been parked in the Ward's parking lot for some time before her body was found.

A teller working at the drive up window at Capitol Federal Savings and Loan in Topeka testified she cashed a check in the amount of $500 for Mrs. Woody at approximately 4:00 p.m. on June 16. On cross-examination, the teller stated that she could not be positive that the check was cashed at 4:00 p.m.; it could have been cashed earlier in the day.

Officers with the Crime Scene Search Team processed the homicide. They dusted for fingerprints and took photographs. The officers testified as to a number of items which were found in Mrs. Woody's car. A white purse was located behind the passenger seat. Its contents were strewn out on the right rear floorboard. It appeared that someone had gone through the purse. Near the purse were a makeup case, a Capitol Federal Savings book, a woman's brown billfold, and an appointment book. No money was found in the vehicle. On the front floorboard of the passenger side, the officers found an open shoe box with a pair of brown shoes, a pair of tennis shoes, a small book, and a package of Kleenex.

The Woody murder was unsolved for several years. In March 1987, the Woody file was turned over to a special agent with the Kansas Bureau of Investigation (KBI). At that time, the agent was also involved in the investigation of a homicide in Kansas City in which Wimberly was a suspect. The agent noticed some peculiarities in the slugs that were removed from Mrs. Woody's body and vehicle. He determined that the slugs were similar to the slugs found in connection with the Kansas City investigation.

Another special agent with the KBI went to Wimberly's place of employment and asked Wimberly to accompany him to KBI headquarters for an interview in connection with the Kansas City homicide. Wimberly was asked if he would allow the KBI to take his fingerprints and samples of his hair and saliva. According to the agent, Wimberly was free to go at any time and was not

obligated to give the samples or fingerprints. The agent described Wimberly as "extremely cooperative." The agent believed that the interview and fingerprinting of Wimberly were for the Kansas City case. On cross-examination, the agent testified as follows:

"Q. And you did not tell him at that time words, 'You don't have to come'?
"A. Not those words, no sir.
"Q. And at any time when you visited with him, did you ever tell him, 'You don't have to give fingerprints'?
"A. No sir.
"Q. And you also told him that the only reason you wanted the prints was for elimination purposes?
"A. Yes, sir.
"Q. And at the time you told him that, he had not been excluded as a suspect, had he?
"A. No, sir.
"Q. At that time he was, in other words, still a possible suspect?
"A. Yes, sir.
"Q. And before giving him—before having him give any of the sample fingerprints, hair, saliva, did you ever show him a Consent to Search form?
"A. No, sir.
"Q. You do have Consent to Search forms at the KBI, don't you?
"A. Yes, sir."

(The references to Wimberly being a suspect are in regard to the Kansas City investigation, not the Woody murder.)

At the hearing on the motion to suppress the fingerprints and hair and saliva samples, Wimberly testified that he was not informed by the KBI officers that he did not have to give the samples. When asked why he gave his fingerprints, Wimberly testified, "Number one, the way I was being sort of commandeered around, it gave me the impression, 'Hey, you have to do this. They're telling you to do this.'" After the fingerprints and samples were taken, Wimberly was moved to the Topeka Police Department for a polygraph test. Wimberly testified that, in the course of explaining the polygraph test, the police detective told him that he did not have to take it if he did not want to. Wimberly testified that until that point he was not informed that he was free to go at any time. The trial court held that Wimberly voluntarily consented to the taking of his fingerprints and of the other samples.

Two fingerprint specialists, one with the Federal Bureau of Investigation (FBI), and the other with the KBI, testified re-

garding the latent fingerprints and palm prints found on the items in Mrs. Woody's car. Wimberly's fingerprints were found on a Standard Oil charge receipt dated January 10, 1981, and a King Travel receipt dated May 6, 1981. The two receipts were inside Mrs. Woody's billfold that was found in the back seat of her car. Wimberly's fingerprints were also on the shoe box and the Kleenex package that were found in the front seat of the car.

A witness, who works in the federal building across the street from where Mrs. Woody was found, testified that Wimberly had been in the witness' office sometime during the day on June 16, 1981. He could not give an exact time. Another witness testified that he had seen a handgun in Wimberly's car while that witness was cleaning the car for Wimberly about a year prior to the Woody murder. Six close friends of the Woodys testified that they had never heard Mrs. Woody mention Wimberly nor had they ever seen him in her company.

An employee of Hallmark Cards testified that, when she was leaving work with a co-worker on the evening of June 16, 1981, she observed three people in or around the car parked next to hers. She described the people as one woman and two men, either Caucasian or Hispanic. Wimberly is black. The Hallmark employee testified that the three appeared to be listening to a police scanner or a CB radio. She thought that one of them said, "They haven't found her yet." She thought that the people seemed suspicious. They were not Hallmark employees, and they did not move so that her co-worker could enter her car. Hallmark is located one block east of Montgomery Ward where Mrs. Woody's body was found. The Hallmark co-worker testified that, after hearing the report regarding the discovery of Mrs. Woody's body, the two felt that they should report what they saw to the police.

At sentencing, the State moved to invoke the Habitual Criminal Act based on a military court-martial in which Wimberly pled guilty to felony murder and felony theft. Wimberly objected, contending that a military court martial is not a conviction contemplated by the Act.

In sentencing Wimberly, the trial judge noted the prior military felony-murder conviction in which Wimberly pled guilty to killing a young man and taking his car, money, and credit cards to go on a date. The trial court observed that Wimberly's record in-

cluded seven criminal convictions, including larceny in 1967 and employment security fraud in 1983. The trial judge sentenced Wimberly to life imprisonment and enhanced the sentence with a consecutive sentence of life imprisonment. Wimberly's motion to modify sentence was denied.

### Sufficency of the Evidence — The Fingerprints

Wimberly raises two points in support of his contention that there was insufficient evidence to convict him of felony murder. First, he argues that there was insufficient evidence to connect him to the murder of Mrs. Woody. Second, he argues that the conviction of felony murder cannot be sustained because there was insufficient evidence of the underlying felony, aggravated robbery. Our standard of review was recently stated in *State v. Walker*, 244 Kan. 275, 280, 768 P.2d 290 (1989) (whether the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt). The prosecution is not under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 326, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979).

The evidence against Wimberly was predominantly circumstantial. Wimberly asserts that, at most, the prosecution proved that Wimberly had handled some of the items found in Mrs. Woody's car. It should be noted that the two receipts upon which Wimberly's fingerprints were found were *inside* Mrs. Woody's billfold. Wimberly emphasizes that, besides Mrs. Woody's own prints, six prints were identified as his, while seventeen were unidentified. The FBI expert testified that there was no way of determining when the fingerprints were placed on the items. None of the hairs found in Mrs. Woody's car were Negroid hairs.

Testimony placed Wimberly within a block of where Mrs. Woody's body was discovered on the day of the murder. A witness testified that he had seen a handgun in Wimberly's car prior to Woody's death. The witness was not sure what caliber the weapon was, but he said that it could have been a .38. The witness had been placed at a Shawnee County Youth Center group home where Wimberly was employed. The defense called another employee of the Shawnee County Youth Center who testified that

the State's gun witness has a tendency to exaggerate the truth and is intimidated by authority figures.

Wimberly relies upon *United States v. Nazarok,* 330 F. Supp. 1054 (E.D. Pa. 1971); *State v. Scott,* 296 N.C. 519, 251 S.E.2d 414 (1979); and *Crouch v. State,* 498 S.W.2d 97 (Tenn. 1973). In *Scott,* a rancher was found murdered in his rural home when his niece, who resided with him, returned from work. The only evidence connecting the defendant to the crime was a single thumbprint which was found on a metal box in the family business office in the house.

The Supreme Court of North Carolina reversed the defendant's conviction. It held that, because the niece worked full time during the week, she had no knowledge of who came to the house during the weekdays to visit her uncle or conduct business with him. The court noted that the State had not presented any evidence which would exclude the possibility that the defendant had visited the house and touched the box on an occasion prior to the murder and the robbery.

In *Crouch,* there was no other circumstantial evidence tending to exclude the hypothesis that a single thumbprint was impressed at a time other than that of the crime.

*Nazarok* involved a single fingerprint, found within hours after the robbery, somewhere in or on the car used by the robbers. The testimony was that the robbers wore gloves during the robbery. There was no corroborating evidence placing defendant Nazarok near the scene. There was testimony that the print could have possibly been placed on the car at any time during its three-year life. There was no evidence as to the location on the car from which Nazarok's print was lifted. The court noted it might have been on a fender, hood, gas cap, or window.

Wimberly also cited *Borum v. United States,* 380 F.2d 595 (D.C. Cir. 1967). The United States Court of Appeals in *Borum* reversed the defendant's conviction for housebreaking. The court commented:

"The Government's evidence shows that Borum touched the one or two jars in question. But there is no evidence, *either direct or circumstantial,* which indicates that he touched the jars in the course of a housebreaking on June 2, 1965. Indeed, one of the Government's own witnesses testified that Borum's fingerprints could have been on the jars 'indefinitely.'

. . . The Government introduced no evidence which could account for, or even suggest an inference about, the custody or location of the jars during that period." 380 F.2d at 596.

The Court of Appeals reasoned that "the case should not have been submitted to the jury, for the Government produced no evidence, *either direct or circumstantial,* which could support an inference that the fingerprints were placed on the jars during commission of the crime." 380 F.2d at 597.

The State's witnesses who testified regarding whether Mrs. Woody was acquainted with Wimberly were acquainted with Woody either through the church or Mr. Woody's business. At least one of these witnesses had known the Woodys for 35 years. One witness described the Woodys as the grandparents that his children had never had. None of these witnesses had ever seen or heard of Wimberly prior to Mrs. Woody's death.

The court in *Borum,* reasoned that the defendant's conviction for housebreaking could not be predicated on fingerprints removed from objects in the home "in [the] absence of evidence indicating that such objects were generally inaccessible to defendant." 380 F.2d 595. A jury could reason that the two receipts containing Wimberly's fingerprints that were removed from Woody's billfold were not objects that were accessible to Wimberly prior to the crime.

The fact that other fingerprints, in addition to Wimberly's, found at the scene of the homicide were not identified or explained affected the weight of the fingerprint evidence rather than its admissibility. *State v. Hall,* 262 So. 2d 498, 499 (La. 1972).

Wimberly is, in effect, requesting this court to reweigh the evidence. This we will not do. It is the jury's function to weigh the evidence and determine the credibility of the witnesses, not ours. The jury carries the responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson,* 443 U.S. at 319.

The cardinal question for our review is whether we are convinced that a rational factfinder could have found Wimberly guilty beyond a reasonable doubt from the evidence viewed in the light most favorable to the prosecution. Wimberly's challenge to the

sufficiency of the evidence connecting him with the murder of Mrs. Woody fails.

Wimberly also contends that his conviction of felony murder cannot be sustained because there was insufficient evidence to prove the underlying felony. The complaint charged Wimberly with the crime of first-degree murder "while in the perpetration or attempt to perpetrate the crime of Aggravated Robbery." The jury was instructed as follows:

"The defendant is charged with the crime of murder in the first degree. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. That the defendant killed Sarah M. Woody;

2. That such killing was done while in the commission of aggravated robbery, a felony; and

3. That this act occurred on or about the 16th day of June, 1981, in Shawnee County, Kansas.

. . . .

"The elements of the crime of aggravated robbery referred to in the preceding instruction are as follows:

1. That the defendant intentionally took property from the person or presence of Sarah M. Woody.

2. That the taking was by force;

3. That the defendant was armed with a dangerous weapon or inflicted bodily harm on any person in the course of such conduct; and

4. That this act occurred on or about the 16th day of June, 1981 in Shawnee County, Kansas."

The jury was also instructed on second-degree murder and voluntary manslaughter. The evidence showed that Mrs. Woody had $500 in cash with her at some point during the day of her murder. There was no cash in her billfold, purse, or vehicle when her body was found. In addition, her purse was dumped out on the floor next to her body, and its contents were strewn about.

In *State v. Wise*, 237 Kan. 117, 123, 697 P.2d 1295 (1985), the defendant argued that he could not be convicted of felony murder where he was not charged and convicted of the underlying felony. We held that an accused need not be prosecuted or convicted of the underlying felony in order to be convicted of felony murder.

There was no suggestion of the existence of any motive other than robbery for the brutal shooting of Mrs. Woody. There was

sufficient evidence to support a charge of felony murder based on the underlying felony of aggravated robbery.

## Wimberly's Motion to Dismiss

Wimberly contends that the case should have been dismissed after the preliminary hearing because no evidence was presented to indicate that any property had been taken from Mrs. Woody. We discussed the nature and purpose of preliminary hearings in *State v. Boone*, 218 Kan. 482, 485, 543 P.2d 945, *cert. denied* 425 U.S. 915, *reh. denied* 425 U.S. 985 (1975).

"[A] preliminary examination is not a trial of a defendant's guilt; it is rather an inquiry whether the defendant should be held for trial. Its principal purpose is the determination of whether a crime has been committed and whether there is a probability that the defendant committed the crime." *In re Mortimer*, 192 Kan. 164, 166, 386 P.2d 261 (1963).

In the case at bar, there was no question that a crime had been committed. There was no question that Woody's death was a result of foul play. At the preliminary hearing, the State presented the fingerprint evidence and the testimony regarding Woody's $500 withdrawal on the day of her death. The parties stipulated to testimony which placed Wimberly in the vicinity of the crime. This evidence was sufficient to bind Wimberly over for trial.

## Wimberly's Motion to Suppress the Fingerprints and Palm Prints

Both parties agree that this issue is controlled by *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973). Bustamonte was a passenger in a vehicle which was pulled over because of a burned-out headlight. Another passenger in the car told the officer that the car belonged to the passenger's brother and gave the officer permission to search the vehicle. The glove box and the trunk were unlocked and opened for the officer. Under the left rear seat, the officer found three wadded-up checks that had been stolen from a car wash. The trial court found that the search was consensual and denied Bustamonte's motion to suppress the evidence seized. The California appellate courts affirmed the defendant's conviction. The United States District Court denied defendant's petition for habeas corpus. The Court of Appeals for the Ninth Circuit held that in order for consent to the search to be held voluntary it must be found that

the person who consented to the search knew that he had a right to refuse such consent. It then vacated the order denying the writ and remanded the case. 448 F.2d 699. The United States Supreme Court reversed.

The issue raised before the Supreme Court was what constitutes voluntary consent.

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent. As with police questioning, two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion." 412 U.S. at 227.

In *Schneckloth,* the defendant was not the owner or the driver of the vehicle searched and the consent to search was given by another individual. The search did not take place at police head-quarters. In Wimberly's case, two KBI officers came to Wimberly's place of employment and asked him to accompany them to KBI headquarters. Agent Schmidt testified that Wimberly was *not under arrest and that he was extremely cooperative.* Wimberly described his impression of the agents' conversation:

"Two gentlemen were out there and they identified themselves, who they were, and told me that they needed me to come with them and if I have trouble getting permission to leave, then they would talk to my supervisor. I, at that point, went and talked to my supervisor. He told me—gave me permission to leave. I didn't know where I was going. They asked me to come with them and I said I would and at that point, the way they were telling me things, saying things, it was like, well, either, 'Come let's go, do it anyway against your will.' "

Upon arrival at KBI headquarters, the agents asked Wimberly if he would give fingerprints and saliva samples. Wimberly testified that he was not informed that he did not have to submit to the fingerprinting. Agent Schmidt corroborated Wimberly's testimony. Schmidt also testified that Wimberly was not under arrest and that he was free to go at any time.

Upon being taken to the Topeka Police Department to undergo a polygraph test, Wimberly was informed that he did not have to take the polygraph. The defense emphasizes the fact that as

soon as Wimberly was so informed he refused consent and asked to leave.

On cross-examination, it was revealed that Wimberly has a four-year college degree in criminal justice. Wimberly, however, claimed that he had not had any courses in criminal law or criminal rules. In denying the defense motion to suppress the fingerprint card, the trial court made the following comments:

"[T]he factors the Court mentioned are the age of the person, his education, intelligence, his mental and physical condition at the time, whether he's under arrest, the length and nature of other interrogations, whether he's been advised of his right to refuse to consent is one of the factors. It seems to me that Mr. Wimberly, while he denies that he's taken a course in criminal law, it's interesting in that curriculum. I'm surprised.

. . . .

"I'm not going to doubt him, but it certainly seems interesting to me that it's not a 101 course. But in any event, he is a college graduate and in a related area and under the circumstances described I can't see that there's any sort of coercive detention here or that the confession—not the confession—the statement that he gave and the physical samples were not cooperative. The reasonableness of the interview, I think, is adequately explained by the KBI officers."

The trial court had the opportunity to hear the testimony of both Wimberly and Schmidt. The trial court did not abuse its discretion in allowing the fingerprint card to be admitted as evidence.

### Failure to Instruct on Circumstantial Evidence

Wimberly contends that it was error for the court to deny his requested instruction on circumstantial evidence. He argues that the instruction was crucial to his theory of the case—that the State's case against him was entirely circumstantial. We discarded our rule requiring the giving of a circumstantial evidence instruction 16 years ago in *State v. Wilkins,* 215 Kan. 145, 156, 523 P.2d 728 (1974).

The jury was properly instructed as to reasonable doubt. The Committee on Pattern Jury Instructions for Kansas (PIK) has recommended that no instruction on circumstantial evidence be given. PIK Crim. 2d 52.16. In *State v. Powell,* 220 Kan. 168, 551 P.2d 902 (1976), we held that, although a circumstantial evidence instruction should not be given, it was not reversible error to give such an instruction as it is generally beneficial to

the defendant. The court stated, "It is the province of the jury to weigh the evidence and a trial court should not by its instructions attempt to stress the comparative weight and strength of any particular type of evidence." 220 Kan. at 174.

The trial court did not err in denying the requested instruction.

## The Prior Military Conviction

Wimberly was convicted of felony murder and felony theft in 1969 in a military court-martial. Wimberly pled guilty and was sentenced to 45 years. He was released in 1977. Based on that conviction, the trial court enhanced Wimberly's sentence, sentencing him to two life sentences instead of one.

Wimberly argues that it was error for the court to enhance his sentence based on a military court-martial, citing *State v. Paxton*, 201 Kan. 353, 440 P.2d 650, *modified* 201 Kan. 607, 440 P.2d 650, *cert. denied* 393 U.S. 849 (1968). We agree.

The defendant in *Paxton* had been convicted by a general court-martial of robbery and felonious assault. We held that a prior conviction by court-martial may not be used to invoke the provisions of the Habitual Criminal Act. 201 Kan. at 365.

*Paxton* was decided in 1968 under K.S.A. 21-107a (Corrick), which was the precursor of the current Habitual Criminal Act found at K.S.A. 21-4504. "However, even though the language of the successor statute, K.S.A. 21-4504, is different, the legislative purpose and intent behind our present statute is clearly the same as it was behind 21-107a." *State v. Baker*, 237 Kan. 54, 56-57, 697 P.2d 1267 (1985). The State points out that, under the present Habitual Criminal Act, enhancement is discretionary with the trial court in cases of a second conviction whereas under the old statute, the trial court had no discretion. We note, however, that a third felony conviction requires the judge to enhance the sentence.

K.S.A. 21-4504 has been amended several times since 1968, the date of *Paxton*. We presume that the legislature acted with full knowledge of *Paxton* in effecting the later amendments. See *City of Lenexa v. Board of Johnson County Comm'rs*, 237 Kan. 782, 786, 703 P.2d 800 (1985).

The district court was in error in imposing an enhanced term based on the prior military court-martial conviction. The addi-

tional consecutive life sentence is vacated; otherwise, the judgment of the district court is affirmed.

Affirmed in part, reversed in part, and remanded for resentencing.