No. 59,788

STATE OF KANSAS, *Appellee*, v. FREDERICK MARTIN, *Appellant.*

(740 P.2d 577)

Opinion filed July 17, 1987.

*Benjamin C. Wood,* chief appellate defender, was on the brief for appellant.

*Wesley K. Griffin,* assistant district attorney, *Robert T. Stephan,* attorney general, and *Nick A. Tomasic,* district attorney, were on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: This is a criminal action where the defendant, Fred-

erick Martin, takes a direct appeal from his convictions of felony first-degree murder, K.S.A. 21-3401; aggravated kidnapping, K.S.A. 21-3421; and unlawful possession of a firearm, K.S.A. 21-4204(b).

The facts giving rise to Martin's convictions are as follows. In June of 1985, Brenda Adams filed for divorce from her husband, Eddie Adams. Eddie moved out of the couple's residence in Kansas City, Missouri, and into his mother's home. Shortly thereafter, Brenda began seeing the appellant, Frederick Martin. Brenda and Fred had met at the Western Missouri Mental Health Center where Brenda was employed as a pharmacist and Fred as a maintenance worker.

In the early morning hours of October 11, 1985, Eddie Adams walked into Brenda's home after seeing Fred's car parked outside. Eddie was enraged. He began yelling at Brenda and Fred, saying, among other things, that if he had a gun, he'd kill them both. Fred, who was sitting on the bed, told Brenda to dress her 18-month-old daughter, Alicia, and leave with him. At that point, Eddie began striking Brenda, cutting her head. Brenda dripped blood from her head and nose in the bedroom, bathroom, and a hallway.

Sometime during this altercation, Fred left the house but telephoned a short time later and spoke with Eddie. About ten minutes later, there was a knock at the door. Brenda looked out the window and saw a car belonging to James (Monk) Moore parked on the street in front of the house, and Fred's car parked in the driveway. Brenda knew Monk to be a friend of Fred's. She then observed the door being kicked in by Fred and Monk as they entered the house.

Monk was holding a handgun, which he held to Eddie's head, while Fred pushed Eddie toward the sofa. Monk reached into the closet and pulled out a cord from an unused telephone, and Fred used the cord to tie Eddie's hands behind his back. Fred then threw Eddie on the floor, stuffed a T-shirt in his mouth, and tied it around the back of his head. Brenda pled with Fred to stop. Fred responded, "If you plead for his life, then you can go with him." Brenda understood this statement to mean Fred and Monk would do the same thing to her they were doing to Eddie. She was afraid they would kill her.

Fred next took Brenda into the bedroom and explained to her that he was not going to hurt Eddie, but instead, intended only to scare him so he would stop beating Brenda. Fred then went back into the living room, leaving Brenda in the bedroom until she heard the front door close a few minutes later. Brenda ascertained the three men were gone.

About 30 minutes later, Fred and Monk returned to Brenda's house. They began replacing the door facing which they had kicked off earlier. Brenda asked Fred what had happened to Eddie. He told her he was going to take Eddie's car to him and if Brenda was worried about Eddie, she should call Eddie's mother's house where Eddie would be in 30 to 35 minutes. Fred then left in Eddie's car with Monk following.

Fred returned in 40 minutes. He then took Brenda to the hospital for treatment for the head wound she had suffered.

No one saw Eddie Adams alive after October 11, 1985. His body was found October 30, 1985, in a vacant, weed-covered lot near Third and New Jersey in Kansas City, Kansas. An investigation revealed the victim's neck, hands, and feet had been tied with a telephone cord and a gag made of a knit material was found in the victim's mouth. An autopsy revealed the victim had been shot in the chest and in the back of the neck. The lack of external bleeding indicated the victim had not been moved after the shooting.

Brenda Adams was first interviewed by Kansas City police on November 1, 1985. On that date, Brenda gave a statement saying Eddie had come to her house on the evening of October 11, 1985, argued with her about the divorce and child support, beat her, and then left. She further stated that after Eddie left she called Fred and told him she was scared and needed to be taken to the hospital. Fred took her to the hospital and afterwards she went to Fred's apartment for the remainder of the evening.

In early November, the police received an anonymous tip through the TIPS hotline. The caller alleged the death of Edward Adams could have occurred at the Kansas City, Missouri, residence of Brenda Adams. Police officers proceeded to Brenda's home and received her consent to search the residence. The search included the use of a substance called "luminol" to detect the presence of blood in the house. Blood was found in

the bedroom, hallway, and bathroom of the home. However, no blood matching the blood type of Eddie Adams was found.

While the police were searching her home, Brenda was allowed to go for a cup of hot chocolate with her neighbor, Rosie Patrick. When Brenda returned she gave the police a new statement, implicating Fred Martin in the murder of Eddie Adams. In her new statement, Brenda told the police essentially the facts as stated here. She later repeated the same statement of facts at trial. Rosie Patrick also gave the police a statement, in which she said that her friend, James "Monk" Moore, told her he and "Black Jesus" (Frederick Martin) had "already done the thing on him" (Eddie Adams).

Based on these statements, the matching condition of the victim when found, and the TIPS hotline information, a warrant was issued for the arrest of Frederick Martin and James Moore. Frederick Martin was initially charged with one count of first-degree murder. The charges were later amended to include aggravated kidnapping and unlawful possession of a firearm.

At trial, Frederick Martin testified on his own behalf. He stated that he did not recall where he was on the evening of October 11, 1985. He further testified he was not involved in the incident described by Brenda Adams.

The jury found Martin guilty of all three of the charges against him. He was sentenced to consecutive life terms for the offenses of first-degree murder and aggravated kidnapping. He further received a sentence of three to ten years for unlawful possession of a firearm, with this sentence to run concurrently with the life sentence imposed for aggravated kidnapping.

Codefendant James "Monk" Moore was acquitted following a jury trial in December of 1986.

Frederick Martin perfected this appeal.

The first issue on appeal is whether the trial court erred in allowing the appellant to act as co-counsel.

In a pretrial hearing held on May 30, 1986, the court considered the appellant's motion to act as co-counsel. During the hearing, the following conversation took place between the court, the appellant, and his court-appointed counsel, Mr. Way:

"MR. WAY: Okay. Your Honor, I have two others here; one's the motion for a co-counsel, signed by Mr. Martin, and he may be able to articulate some of these

in a different fashion than I can, however, he has set those out there and *he's fairly articulate in his written presentation, and he's asking to be co-counsel.*

"THE COURT: What do you want there, Fred; I don't know what you're after.

"THE DEFENDANT: Well, Your Honor —

"THE COURT: You've got a right to participate in the trial, but the way we run things in all trials is there can just be one attorney do the cross-examination or the direct and do the voir dire and do anything else.

"THE DEFENDANT: I understand that.

"THE COURT: *You know, you can go pro se if you want to and do it all yourself, but I wouldn't advise you to do it.*

. . . .

"THE DEFENDANT: All I want to do is to be assured that I will be able to exercise my constitutional rights, that's all.

"THE COURT: All I'm saying, you can talk to Jan [Mr. Way] as much as you want and give him whatever questions you want to ask, but I'm not going to allow you both to examine witnesses or something.

. . . .

"MR. GRIFFIN: The State would have no objections; I don't care if he questions the witnesses, but exactly what you're saying, only one does it, whether it's Jan or whether it's him, one can do it; I don't care if he participates in the questions.

"THE COURT: I don't care which one of you is.

"THE DEFENDANT: I have been denied this right previously and that's why I put it before the Court, to ask you today.

"MR. GRIFFIN: Judge, I think for—for the record, and I think Mr. Way, as an officer of the Court could back it up, I think he's been heard in every hearing we've had, isn't that correct, Mr. Way, where he's asked to be heard, and has been heard, whether his motions were granted or not, he has had his say.

"MR. WAY: I think the problem he envisions, Your Honor, or sees previously has to do with his motions, his written motions as from here on, we are talking more of oral presentations of the Court.

"THE COURT: From here on we are talking about co-counsel at trial and that's what I don't know.

"MR. WAY: It's a little bit different function.

"THE COURT: That you understand.

"MR. WAY: Of course I understand.

"THE COURT: If somebody takes a stand and Wes examines them and cross-examines, you could do it and Jan could do it, but you're not going to both do it.

"THE DEFENDANT: The only thing I'm asking, Your Honor, is that I be assured of the fact that I will be able to exercise my constitutional right.

"THE COURT: Let me assure you this, that you will be able to exercise your constitutional right, but I'll have to rule on it at the time if there is something against what I just said.

. . . .

"THE DEFENDANT: I'll make myself crystal clear so there will be no

misunderstanding by anybody. I may not choose to exercise my constitutional rights at all, but I want to know and be reassured that if I do make that choice, that I would be allowed to.

"THE COURT: Been here eleven years and had eleven appeals and everybody's exercised their constitutional rights that I know of, Fred.

"THE DEFENDANT: Thank you, Your Honor."

We conclude from this colloquy that the trial court determined the appellant could act as co-counsel with Mr. Way, but only one person could act as counsel at any given time.

During the trial, the appellant cross-examined only one witness—Detective Ken Allen. Appellant now contends it was error for the court to allow him to act as co-counsel without first determining he had knowingly and intelligently waived his right to counsel. The State, on the other hand, contends the court did not err because the appellant requested only that he be allowed to act as co-counsel, and thus did not waive his right to counsel.

Let us examine this issue. In *State v. Ames*, 222 Kan. 88, 99-100, 563 P.2d 1034 (1977), we held that, while a party has the right to represent himself or be represented by counsel, he does not have the right to a hybrid representation. Further, the defendant who accepts counsel has no right to conduct his own trial or dictate the procedural course of his representation by counsel.

The appellant clearly has the right to self-representation, as recognized by the United States Supreme Court in *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975), and by this court in *State v. Williams*, 226 Kan. 82, 595 P.2d 1104 (1979). However, we have also noted that the election to represent oneself must be knowingly and intelligently made.

In *State v. Daniels*, 2 Kan. App. 2d 603, 607, 586 P.2d 50 (1978), the Court of Appeals held that a trial court must make more than a routine inquiry to determine if a waiver of the right to counsel was knowingly and intelligently made. The Court defined a waiver as an intentional waiver of a known right, made with full awareness of the effect, citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L. Ed. 2d 1461, 58 S. Ct. 1019 (1938). In order to aid the trial court judge in making this determination, the Court of Appeals set forth minimum standards of inquiry as follows:

"The ABA Standards Relating To the Function of the Trial Judge, § 6.6 at 84,

85 (Approved Draft, 1972), suggest the trial judge's inquiry show that the defendant:

"'(i) has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled;

"'(ii) possesses the intelligence and capacity to appreciate the consequences of this decision; and

"'(iii) comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case.'

"To that, we would suggest that the trial judge also inform the defendant (1) that defendant will be held to the same standards as a lawyer; (2) that the trial judge may not aid the defendant in his defense; and (3) that it is advisable to have a lawyer due to the specialized knowledge necessary to conduct a trial and the fact that a lawyer is trained in the law." 2 Kan. App. 2d at 607-08.

See *In re Habeas Corpus Application of Gilchrist,* 238 Kan. 202, 209, 708 P.2d 977 (1985); *State v. Williams,* 226 Kan. at 83-84.

It is clear that the "minimum standards" enunciated above were not met in the instant case. The trial court did not clearly advise Frederick Martin of his right to assistance of counsel. Nor did the court inquire as to the appellant's understanding of the consequences of his decision, the nature of the proceedings against him, or the range of permissible punishments.

However, this is not a case of pro se representation. Martin merely requested he be permitted to be co-counsel. Thus, no waiver of the right to counsel was required. He had counsel. No warning was required. This issue is without merit.

Next appellant complains the trial court erred in admitting Rosie Patrick's hearsay statement over his objection. As a result of appellant's cross-examination of Detective Allen, the State was permitted to introduce the statement of Rosie Patrick. It contained an extrajudicial confession of James "Monk" Moore which implicated the appellant in the murder of Eddie Adams. The appellant questioned Detective Allen as follows:

"Q: Okay, when you went downtown and you gave the statement, did you take a statement from her neighbor?

"A: Yes, I did.

"Q: Okay. And I know you don't want to go into details of her neighbor's statement, but did it coincide with Brenda's any kind of way?

"A: Oh, yes.

"Q: It did coincide?

"A: Yes.

"Q: Okay. After that time had your investigation centered on any particular person at that time?

"A: Whenever I talked to her.

"Q: Right on the 4th, did it center on any particular person at that time?

"A: As soon as she told me the two names of the people that was involved in that homicide, it sure did.

"Q: Okay, centered on the defendants in this case?

"A: Yes.

"Q: Okay, Now, I am finding out. So Brenda's statement was collaborated [sic] by her neighbor's. All right."

During the State's redirect examination of Detective Allen, the prosecutor sought to admit the statement of Rosie Patrick. The court permitted its introduction since "he [Frederick Martin] opened the door" by discussing the contents of the statement during his cross-examination of the witness. The statement by Rosie Patrick was thus read to the jury. The statement read, in pertinent part:

"On 10-27-85, a week ago Sunday, a friend of mine, named James 'Monk' Moore, a black male, about 32 years old, came by my house. 'Monk' had a young lady with him but I don't know who she was. He was driving a big car, possibly a Chrysler, that had a white top and gold bottom. He asked me if I had heard the disturbance next door and I told him I had. He said, 'Well, that was me and Black Jesus [Frederick Martin] over there.' 'Monk' said that he and Black Jesus had kicked in the door and found Edward standing over Brenda, jumping on her. He said he went up and hit Edward in the side of the face with a pistol and told him to get off 'that woman.' I said, 'You're kidding,' and he said, 'We've already done the thing on him.' My husband came in the door and that pretty well ended the conversation. I didn't know until this past Saturday, November 2nd, 1985, that Edward Adams had been found dead."

The statement given by Rosie Patrick contained incriminating information regarding the appellant's involvement in Eddie Adams' murder. However, in light of appellant opening up the issue on cross-examination of Detective Allen, we hold it was proper for the State to introduce the Patrick statement. It has long been held that, on redirect examination, a witness may be asked questions to clarify or modify statements made on cross-examination, or to explain or rebut the effect of a new matter brought out on cross-examination, even though the witness did not testify concerning such matters on direct examination. *State v. Beard,* 220 Kan. 580, 552 P.2d 900 (1976). This issue is without merit.

Appellant next alleges the trial court erred in failing to dismiss the charge of unlawful possession of a firearm because the

evidence showed that only James "Monk" Moore possessed a gun. Thus, appellant argues he could not have exercised "dominion and control" over the gun and the element of possession necessary to convict him of unlawful possession of a firearm is absent.

We addressed the issue raised by appellant in *State v. Cunningham*, 236 Kan. 842, 695 P.2d 1280 (1985). There, the defendant was charged and convicted of aggravated burglary, aggravated robbery, and unlawful possession of a firearm. On appeal, the defendant argued the trial court erred in failing to dismiss the counts of aggravated robbery and unlawful possession of a firearm because there was no evidence as to whether he or his accomplice carried a gun. Instead, the testimony simply was that one of the two men carried a gun. The defendant contended that the crime of unlawful possession of a firearm requires proof of defendant's actual control of a firearm.

We held in *Cunningham* that the charge of unlawful possession of a firearm does not require proof of actual control of the weapon. In support thereof, we cited a number of cases where charges of unlawful possession of a firearm were upheld without evidence of the defendant's actual control of the gun. 236 Kan. at 845-46. We further noted:

"[A] holding that where one of two indistinguishable burglars wields a gun during the crime either or both may be charged with unlawful possession of the firearm is consistent with traditional aiding and abetting law. It is well settled that all participants in a crime are equally guilty without regard to the extent of their participation, and that any person who counsels, aids or abets in the commission of an offense may be charged, tried and convicted in the same manner at though he were a principal. *State v. Maxwell*, 234 Kan. 393, Syl. ¶ 6, 672 P.2d 590 (1983). The point lacks merit." 236 Kan. at 846.

Appellant attempts to distinguish *Cunningham* by arguing that in *Cunningham* the defendant *could have been* the one who held the gun, since the testimony showed one of the two robbers held the gun. On the other hand, in this case no one ever testified that the appellant held the gun.

His distinction is not valid. *Cunningham* and the present case are essentially the same. No testimony was presented in either case that the defendant held the gun. Further, our holding in *Cunningham* makes it clear the defendant can be guilty of

possession of a firearm as an aider or abettor, regardless of whether he held or had control of the gun.

As a final note on this issue, appellant further argues evidence of his prior conviction was erroneously admitted. He concedes that proof of a previous felony conviction is a required element of the unlawful possession of a firearm charge (see K.S.A. 21-4204[b]), but argues the conviction was inadmissible because the charge of unlawful possession should have been dismissed. Since the unlawful possession charge was proper, evidence of the prior conviction was also properly admitted.

Thus, we conclude the trial court did not err in failing to dismiss the charge of unlawful possession of a firearm, or in admitting the evidence of appellant's prior conviction as an essential element of the firearm charge.

For his next issue Martin contends his conviction of aggravated kidnapping violates the double jeopardy clause of the Fifth Amendment to the United States Constitution and Section 10 of the Bill of Rights of the Kansas Constitution because a defendant cannot be convicted of both felony murder and the underlying felony.

Appellant argues we have never considered the issue now before us; however, he fails to mention the case of *State v. Crump*, 232 Kan. 265, Syl. ¶ 4, 654 P.2d 922 (1982), where we specifically held:

"The crime of first-degree murder resulting from the perpetration of a separate and distinct felony which is inherently dangerous to human life is a separate and distinct statutory crime from that constituting the underlying felony and a prosecution for both crimes does not violate the prohibition against double jeopardy as proscribed by the Fifth Amendment to the U.S. Constitution."

*Crump* clearly holds that a conviction of felony murder and the underlying felony does not violate double jeopardy. This issue is without merit.

Martin next urges the court to find that instruction number 8 unconstitutionally shifted the burden of disproving venue and jurisdiction to him. The instruction in question reads:

"Kansas Statutes Annotated 21-3104 provides in part:

"A. A person is subject to prosecution and punishment under the law of this state if:

"1) He commits a crime wholly or partly within this state.

"2) Being outside the state, he counsels, aids, abets, or conspires with another to commit a crime within this state.

"B. An offense is committed partly within this state if either an act which is a constituent and material element of the offense, or the proximate result of such act, occurs within the state. *If the body of a homicide victim is found within the state, the death is presumed to have occurred within the state.*

"C. It is not a defense that the defendant's conduct is also a crime under the laws of another state of the United States or of another country." (Emphasis added.)

This instruction is derived from the language of K.S.A. 21-3104, which defines the scope of this state's territorial jurisdiction.

The appellant correctly contends that the above instruction permitted the jury to presume that because Edward Adams' body was found in Kansas, his death occurred within the state. However, the appellant argues this presumption improperly shifted the burden of disproving jurisdiction to him.

This argument is without substance. In addition to the above-quoted instruction, the jury received the standard instruction requiring the State to prove the appellant's guilt beyond a "reasonable doubt," and stating the law does not require the defendant to prove his innocence. More importantly, the trial court also instructed the jury as to the elements of each of the crimes for which the appellant was charged. These instructions all required the State to prove a common element: "That this act occurred on or about the 11th day of October, 1985, in Wyandotte County, Kansas."

When instruction number 8 is read in conjunction with the other instructions, it is clear that the burden of proving or disproving jurisdiction was not placed on Frederick Martin.

Appellant, in his pro se brief, makes an additional argument with respect to the presumption issue discussed above. Specifically, he contends the evidence was insufficient to prove the murder occurred in Kansas.

As already pointed out, K.S.A. 21-3104(2) creates a *presumption* that death occurred within this state where the body of a homicide victim was found in the state. In the instant case, the victim's body was found in Wyandotte County. Further, circumstantial evidence strengthened the presumption of death in Kansas. Dr. Alan Roth, who performed the autopsy on the victim,

testified that the bullet in the victim's chest went through the pulmonary artery and the aorta, injuries which normally result in massive bleeding. However, Dr. Roth testified that the lack of external bleeding indicated the victim was not moved after the shooting.

We have held that venue is a question of fact to be determined by the jury and, like any other fact, it may be proved by circumstantial evidence. *State v. Johnson,* 222 Kan. 465, 476, 565 P.2d 993 (1977).

Accordingly, we hold the evidence was sufficient to establish the murder occurred in Kansas.

We have considered every issue raised by appellant on appeal, even though not specifically mentioned herein, and conclude he received a fair trial.

The judgment of the trial court is affirmed.