No. 72,450

STATE OF KANSAS, *Appellee*, v. BRADLEY WADE JOHNSON, *Appellant*.

(905 P.2d 94)

Opinion filed October 27, 1995.

*Michael C. Hayes*, of Oskaloosa, argued the cause and was on the brief for appellant.

*Daniel D. Owen*, county attorney, argued the cause, and *Rex L. Lane*, assistant county attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant was convicted by a jury of first-degree felony murder (K.S.A. 1992 Supp. 21-3401), aggravated kidnapping (K.S.A. 21-3421), and aggravated robbery (K.S.A. 21-3427). Defendant appeals, claiming: (1) improper admission of hearsay evidence; (2) improper admission of gruesome photographs; (3) insufficiency of the evidence; (4) failure to instruct on voluntary intoxication; (5) failure to disclose exculpatory evidence; (6) ineffective assistance of counsel; (7) double jeopardy; (8) failure to give an accomplice instruction; and (9) violation of the witness sequestration rule.

On March 5, 1993, Benjamin Creek's body was discovered in rural Jefferson County, Kansas. There was a 12- to 15-foot piece of rope around his right wrist and a trail of a large amount of blood. Creek had been beaten extensively. There were numerous cuts made by a sharp object on both inner thighs and his neck. The thigh wounds were deep. There were no defensive wounds. Creek died due to blood loss at the location where his body was discovered. Pieces of an automobile window mount gun rack were collected at the scene.

The investigation of Creek's death revealed that Creek, Bradley Johnson, and Frank Sutton (also known as "Spanky") were all present at Sasnak North, a bar in Topeka, the night of March 4, 1993. Johnson, who is Caucasian, and Sutton, who is black, were together. They were short of money, and a bartender bought them two pitchers of beer. Creek was not observed with Johnson and Sutton inside the bar. During the evening Creek asked a Sasnak employee if she knew two men, one black and one white, who were in the bar. She did not. Creek informed her that the men stopped him from leaving the bar and that he had agreed to give the two men a ride.

Creek and his mother had a joint bank account for which Creek had an ATM card. Shortly after midnight two withdrawals totalling $90 were made using Creek's ATM card. A third withdrawal of $50 was attempted but failed for insufficient funds. The next transaction at that ATM machine was by a Topeka police officer. While the officer was waiting to use the machine he observed a dark pickup with two occupants and a third person using the ATM machine. Sutton's image appears on the ATM machine's surveillance camera at the time the withdrawals from Creek's account were made.

After Creek's body was discovered officers went to a residence at 1006 S.E. 8th Street in Topeka where Johnson was staying. John McGill and Dan Deenihan, who lived at that house, informed the officers that Johnson was not at the house when they arrived home on the night of March 4 and 5. They stated that Johnson and Sutton later arrived at the house in a newer model Ford pickup with a white toolbox. Creek's vehicle was a 1988 Ford pickup with a black

bed liner and a white toolbox. McGill noticed that Sutton had blood on his pant leg and tennis shoe. Johnson and Sutton were carrying a shotgun and a hunting vest. Johnson and Sutton later unloaded a red toolbox, a hydraulic floor jack, some crowbars, some nylon tow ropes, and an electric saw from the pickup. They also observed Johnson burn an ATM card.

Officers were allowed to search the residence. Several items were seized, including a butterfly knife, pieces of a broken gun rack, a "for sale" sign with Creek's mother's telephone number on it, and a pair of black jeans with a 38-inch waist and 32-inch length. Johnson wore a size 38 or 40 waist pant. A duffel bag next to the jeans contained papers addressed to Johnson. McGill directed officers to a trash can which contained a piece of burned plastic that could have been the ATM card. Tire impressions in the driveway of 1006 S.E. 8th Street were similar to tire impressions where Creek's body was discovered.

Randy Drown testified that he helped Johnson transport several items and that Drown sold items such as a saw, jumper cables, and tow rope straps. These items were recovered. Several of the items were similar to items belonging to Creek. Drown also testified that he was driving with Johnson and Sutton when Johnson pointed to a truck at the Ripley Park Apartments and said that he and Sutton had acquired the truck the night before.

On March 6 Creek's pickup was found at the Ripley Park Apartments. A witness testified that two men, one Caucasian and one black, left the truck at that location. The exterior of the truck was covered with road dirt. The interior was wet underneath the floor mats, and there was standing water in two frisbees on the floor. Pieces of a broken gun rack were collected from the truck. The pieces of a gun rack collected from the truck, the residence at 1006 S.E. 8th Street, and where Creek's body was found fit together and formed a gun rack.

Johnson was riding with Drown when police stopped the car and arrested Johnson. A knife and sheath were taken from the car. Johnson admitted to the police that he had been to Sasnak's on March 4. When shown Creek's picture, Johnson denied that Creek was at Sasnak's that night. Johnson also denied that he associated

with black people or knew a black male named Frank. He then refused to answer any more questions without counsel.

Hair found on Creek's hands and in Creek's pickup was consistent with Johnson's hair. Blood on the black jeans taken from the 8th Street residence was consistent with Creek's blood and not with Sutton's or Johnson's blood.

Johnson and Sutton were charged in Creek's death. Sutton was convicted of first-degree felony murder, aggravated kidnapping, and aggravated robbery in a separate trial. His conviction was affirmed by this court in *State v. Sutton*, 256 Kan. 913, 889 P.2d 755 (1995).

During Johnson's trial, he presented the testimony of a frequent patron of Sasnak's. The witness testified that he watched a black man and a white man playing pool on March 4. The witness did not see the white man after the last call for beer at 11:30 p.m., but the black man was still in the bar. Two more white men entered the bar, but the witness did not observe if they had spoken to the black man. The black man left around 11:55 p.m. The witness was unable to identify any of the men.

Johnson testified that he went to Sasnak's on March 3, 1993, with Drown and Sutton. Drown had testified that Johnson mentioned finding a "mark" that evening. Johnson did not remember that conversation. Johnson testified that on March 4 he and Sutton returned to Sasnak's. He and Sutton consumed two pitchers of beer, which they paid for by pooling their money. Later that evening, Johnson testified, he realized that Sutton had left the bar. Johnson testified that he went to a friend's house and slept until early afternoon on March 5, then returned to the house on 8th Street.

Johnson denied that the black jeans with blood on them were his and that he had pointed out a truck at the Ripley Park Apartments to Drown. Johnson asserted that he was not the white man who left the truck at the Ripley Park Apartments, that he was never in Creek's truck, and that he had not sold any of Creek's property with Drown. Johnson insisted that he was not involved in Creek's homicide.

The jury convicted Johnson of first-degree felony murder, aggravated kidnapping, and aggravated robbery. Johnson was sentenced to consecutive terms of incarceration of life, life, and 15 years to life. The sentences were tripled under the habitual criminal provisions of K.S.A. 1992 Supp. 21-4504. Johnson appeals.

## HEARSAY STATEMENTS

The defendant first claims the trial court erred in permitting John McGill to testify about statements made by Frank Sutton, who did not testify.

The Sixth Amendment to the United States Constitution provides that in all criminal prosecutions the accused shall enjoy the right to be confronted with the witnesses against him or her. This constitutional provision, however, does not preclude the admission of all out-of-court statements. In *State v. Johnson-Howell*, 255 Kan. 928, Syl. ¶ 3, 881 P.2d 1288 (1994), we noted that the courts should attempt to harmonize the goal of the Confrontation Clause—placing limits on the kind of evidence that may be received against a defendant—with a societal interest in accurate factfinding, an effort which may require consideration of out-of-court statements.

The events leading to the admission of Sutton's statement commenced during defense counsel's cross-examination of McGill. In an effort to suggest that McGill and Sutton had committed the crime, defendant's counsel asked a series of questions implying that McGill had burned the ATM card, Drown had taken McGill to Sasnak's after work on March 4, McGill was the man who left and waited outside Sasnak's that night, McGill had helped Sutton rob Creek, and McGill had unloaded property from the truck. McGill testified that he had never been to Sasnak's and that he was not involved in the crime.

To strengthen the inference that McGill was involved in Creek's death, defendant's counsel then asked McGill: "Now, isn't it true, Mr. McGill, that there is records of phone calls between you and Frank after he was arrested?" and "Are you also aware that a note was found in the house signed Frank Sutton to John and Dan, something to the effect Don't talk, I'll call you or explain to you later, do you remember that note?" McGill admitted there were

telephone calls and the existence of the note. Defendant's counsel elicited no further information about the details of the note or telephone conversations.

Before redirect examination of McGill, the prosecutor informed the judge that to rehabilitate the witness from the implication that McGill was a coconspirator, he would question McGill as to the content of the telephone conversation and the note. Defendant's attorney responded that the details of the telephone conversation or the note had not been alluded to during his examination of the witness.

The court noted that normally any telephone calls, statements to police, or notes made by Frank Sutton would be inadmissible hearsay. It observed that the purpose of the defense line of questioning was to shift the focus from Johnson to McGill as the accomplice to the murder. The court found that because the defense had implied that McGill was involved in the crime with Sutton, it would make an exception to the hearsay rule prohibiting admission of the phone conversation statement and the note. The court concluded that failing to allow the State to rebut the innuendo advanced by the defendant would prejudice the State's right to a fair trial.

McGill testified that the note defendant's counsel brought up was a note from Sutton to Drown, not to McGill, which said, "Randy, tell everybody not to call my house. Will explain later . . . Spanky." McGill also testified that he spoke to Sutton during a phone call initiated by Sutton's wife and joined in by Sutton through three-way calling. McGill testified that Sutton informed him that he had been arrested because he was involved in a murder. Sutton denied he had committed the murder. When McGill asked Sutton if he knew Johnson had been arrested, Sutton replied that "Brad" was the person who got him involved in the murder.

The defendant argues that the trial court erred in permitting this testimony. He reasons that Sutton was not unavailable and that Sutton's out-of-court statements did not meet the necessary test of relevance, reliability, and trustworthiness to be admissible as declarations against interest under K.S.A. 60-460(j).

The trial court agreed that Sutton's out-of-court statements were not admissible under a hearsay exception and, contrary to the defendant's contention on appeal, did not admit the statements as a hearsay exception. The trial court admitted the statements because defense counsel had opened the door to the admission of otherwise inadmissible evidence during his cross-examination.

We have recognized that when a defendant opens an otherwise inadmissible area of evidence during the examination of witnesses, the prosecution may then present evidence in that formerly forbidden sphere. *State v. Garcia*, 233 Kan. 589, 601, 664 P.2d 1343 (1983); *State v. Moses*, 227 Kan. 400, 404, 607 P.2d 477 (1980); *State v. Roach*, 223 Kan. 732, 737, 576 P.2d 1082 (1978); *State v. Wasinger*, 220 Kan. 599, 604, 556 P.2d 189 (1976). By opening the door to otherwise inadmissible hearsay, a defendant waives the Sixth Amendment right to confrontation.

*State v. Martin*, 241 Kan. 732, 740 P.2d 577 (1987), presented a somewhat similar factual situation. A neighbor of the victim's wife gave a statement to police indicating that a friend told her he and the defendant had "done the thing" to the victim. The neighbor did not testify at trial. Her statement to police was not admitted during the police officer's testimony. During the defendant's cross-examination of the police officer, the officer was asked whether the investigation had centered on any particular person after the neighbor's statement. The officer's response was that it focused on a particular person "[a]s soon as she told me the two names of the people that was involved in that homicide." The defendant's counsel's next question was, "Okay, centered on the defendants in this case?" 241 Kan. at 739. On redirect examination of the officer, the State was permitted to introduce the neighbor's statement. The trial court's reasoning for allowing the statement was that the defendant had opened the door by discussing the contents of the statement during his cross-examination of the officer. The *Martin* court affirmed, noting that the defendant had opened up the issue through cross-examination of the officer. 241 Kan. at 739.

Here, defense counsel knew that the note did not implicate McGill and that Sutton had implicated the defendant, not McGill, in the telephone conversation. The defendant sought by cross-ex-

amination of McGill to change the focus of the evidence and implied to the jury that McGill, not the defendant, was Sutton's coparticipant in the crime. Once the defendant addressed the telephone conversation and the note in this manner during cross-examination, the State was entitled to rehabilitate McGill by introducing details of the conversation and note. The trial court was correct in permitting McGill to testify as to the contents of the note and his telephone conversation with Sutton.

## GRUESOME PHOTOGRAPHS

The defendant argues that the trial court erred in admitting multiple and repetitive gruesome photographs over his objection and in displaying slides of the photographs to the jury. He contends that the pictures were not necessary to corroborate the testimony of witnesses nor were they relevant to the pathologist's testimony concerning the cause of death and that pictures of wounds which did not cause death were unnecessarily displayed to the jury.

The admission of relevant gruesome photographs in a homicide case is a matter that lies within the discretion of the trial court, and the trial court's ruling will not be disturbed on appeal absent an abuse of that discretion. Photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence. However, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. *State v. Stone*, 253 Kan. 105, 111, 853 P.2d 662 (1993); *State v. Mayberry*, 248 Kan. 369, Syl. ¶ 12, 807 P.2d 86 (1991).

Despite the similarity between many of the photographs taken at the scene, we cannot say that the trial court abused its discretion in admitting the photographs into evidence. Each photograph depicts Creek's body from a slightly different angle. The photographs show a beaten and cut-up body, the condition of Creek's body when it was found. The pictures may be gruesome and shocking, but they depict what occurred. The trial court did not abuse its discretion in admitting into evidence the photographs taken at the scene.

The defendant also objects on appeal to several photographs taken during the autopsy. The defendant did not object at trial to these photographs. A defendant cannot raise for the first time on appeal points which were not presented to the trial court. See *State v. Johnson*, 253 Kan. 75, 91, 853 P.2d 34 (1993). Therefore, the defendant cannot now complain that the admission of these photographs was error.

Most, if not all, of the photographs of the scene and the autopsy were shown to the jury by slides on a projector. The defendant argues that the trial court failed to view the slides prior to their introduction to determine their admissibility. As authority, the defendant cites *State v. Yarrington*, 238 Kan. 141, Syl. ¶ 2, 708 P.2d 524 (1985), where this court stated that when pictures are to be offered in evidence through the utilization of slides and a projector, the court should view the slides, outside the presence of the jury, in order to avoid showing to the jury what may be determined to be inadmissible evidence.

The defendant made no objection to the use of slides at trial and he cannot now complain that the use of slides was error. In any event, the trial court had no need to view the slides before their introduction here because it had already observed and determined the admissibility of the photographs depicted in the slides. There was no error in introducing the photographs to the jury through the use of slides and a projector.

## SUFFICIENCY OF THE EVIDENCE

For his next issue, the defendant contends that the evidence was insufficient to sustain his convictions.

When the sufficiency of the evidence is challenged on appeal, this court's standard of review is whether, after reviewing all of the evidence, viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Timley*, 255 Kan. 286, Syl. ¶ 13, 875 P.2d 242 (1994). In reviewing the sufficiency of the evidence this court will not reweigh the evidence. It is the jury's function, not ours, to weigh the evidence and determine the

credibility of witnesses. *State v. Wimberly*, 246 Kan. 200, 207, 787 P.2d 729 (1990).

The defendant construes the evidence in the light most favorable to him, but an appellate court must view the evidence in the light most favorable to the State. We have reviewed all the evidence and conclude that the evidence is sufficient to uphold the defendant's convictions. A rational factfinder could have found the defendant guilty of the offenses beyond a reasonable doubt.

In addition, the defendant questions whether venue was proper in Jefferson County. The defendant asserts there was no showing that a kidnapping occurred in Jefferson County because there is no evidence Creek was tied up in Jefferson County. He also contends that there is no showing an aggravated robbery occurred in Jefferson County because money was found on Creek's person, the ATM machine was located in Topeka, and Creek's property was disposed of in Topeka, not Jefferson County. The defendant's argument concerning venue is without merit.

Except as otherwise provided by law, the prosecution shall be in the county where the crime was committed. K.S.A. 22-2602. Where two or more acts are requisite to the commission of any crime and such acts occur in different counties, the prosecution may be in any county in which any of such acts occur. K.S.A. 22-2603.

Aggravated kidnapping, a class A felony, is the taking or confining of a person, accomplished by force, threat or deception, with the intent to hold the person to facilitate the commission of any crime, and where bodily harm is inflicted upon the person. K.S.A. 21-3421. A person charged with the crime of kidnapping may be prosecuted in any county in which the victim has been transported or confined during the course of the crime. K.S.A. 22-2614. Aggravated robbery, a class B felony, is the taking of property from the person or presence of another by threat of bodily harm by a person who is armed with a dangerous weapon or who inflicts bodily harm on the person during the course of the robbery. K.S.A. 21-3427. When property taken in one county by theft or robbery has been brought into another county, venue is in either county. K.S.A. 22-2609. Murder in the first degree, a class A felony, in-

cludes the killing of a person in the perpetration of or attempt to perpetrate any felony. K.S.A. 1992 Supp. 21-3401(a)(1) and (c). If the cause of death is inflicted in one county and the death ensues in another county, the prosecution may be in either of such counties. Death shall be presumed to have occurred in the county where the body of the victim is found. K.S.A. 22-2611. Venue was proper in Jefferson County in this case.

## INSTRUCTION ON VOLUNTARY INTOXICATION

K.S.A. 21-3208(2) provides that "[a]n act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind." A defendant may rely on the defense of voluntary intoxication where the crime charged requires specific intent, and an instruction on voluntary intoxication is required if there is evidence to support the defense. *State v. Gadelkarim*, 247 Kan. 505, Syl. ¶ 1, 802 P.2d 507 (1990).

Here, an aiding and abetting instruction was given to the jury. Aiding and abetting is a specific intent crime. See K.S.A. 1992 Supp. 21-3205; *State v. Warren*, 252 Kan. 169, Syl. ¶ 6, 843 P.2d 224 (1992); *State v. McDaniel*, 228 Kan. 172, Syl. ¶ 4, 612 P.2d 1231 (1980). The defendant reasons that voluntary intoxication was a viable defense because he could have been convicted as an aider and abettor. He claims that because a specific intent was required to aid and abet, the trial court should have instructed the jury on the defense of voluntary intoxication.

The defendant did not request an instruction on voluntary intoxication. Because of the defendant's failure to object at trial, our standard of review is whether the failure to instruct on the defense of voluntary intoxication was clearly erroneous. See *State v. Whitaker*, 255 Kan. 118, 125, 872 P.2d 278 (1994).

Unless evidence is presented that shows intoxication to the extent that a defendant's ability to form the requisite intent was impaired, an instruction on the defense of voluntary intoxication is not required. *Gadelkarim*, 247 Kan. at 508; see *State v. Smith*, 254

Kan. 144, Syl. ¶ 2, 864 P.2d 709 (1993); *State v. Shehan*, 242 Kan. 127, Syl. ¶ 5, 744 P.2d 824 (1987). The defendant has the burden of showing that he or she was so intoxicated that his or her mental faculties were impaired by the consumption of alcohol or drugs. *State v. Keeler*, 238 Kan. 356, 360, 710 P.2d 1279 (1985).

The defendant reasons that there was sufficient evidence to justify a voluntary intoxication instruction. The defendant and another witness testified that the defendant shared two pitchers of beer with Sutton at Sasnak's. The only other testimony as to intoxication was the testimony of a Sasnak employee who stated that Johnson and Sutton were "drunk."

Although there was evidence, presented by both the State and the defense, that the defendant had consumed alcohol, and even by one witness that he was "drunk," the record is devoid of evidence that the defendant's consumption of alcohol impaired his mental faculties so as to render him unable to form the requisite intent. The defendant was able to recall his activities on the night of the offense. See *State v. Ludlow*, 256 Kan. 139, 147-48, 883 P.2d 1144 (1994); *Smith*, 254 Kan. at 152; *State v. Gonzales*, 253 Kan. 22, 26, 853 P.2d 644 (1993); *Shehan*, 242 Kan. at 131-32; *Keeler*, 238 Kan. at 360; *cf. Gadelkarim*, 247 Kan. 509. An instruction on voluntary intoxication was not required.

## WITHHOLDING EXCULPATORY EVIDENCE

The defendant contends that the State failed to disclose exculpatory evidence.

Prosecutors have an affirmative duty, independent of any court order, to disclose exculpatory evidence to a defendant. To justify reversing a conviction for failure to disclose evidence, the evidence withheld by the prosecution must be clearly exculpatory and the withholding of the evidence must be clearly prejudicial to the defendant. Evidence is exculpatory if it tends to disprove a fact in issue which is material to guilt or punishment. Evidence not disclosed to the defendant prior to trial is not inadmissible at trial if the defendant has personal knowledge thereof or if the facts become available to the defendant during trial and the defendant is not prejudiced in defending against them. *State v. Colbert*, 257

Kan. 896, 902, 896 P.2d 1089 (1995); *State v. Peckham,* 255 Kan. 310, 341, 875 P.2d 257 (1994).

The defendant provides two cites to the record to indicate that evidence was withheld from him. The first cite involves the cross-examination of Dr. Tosco, who testified about collecting hair and blood samples from the defendant and Frank Sutton. The defendant's counsel cross-examined Tosco about the procedure she used to obtain the hair and blood samples. Counsel then stated to the court, "Sorry, Judge, this is my first chance to look at these. I will be real careful to keep them on one side or the other." The second cite concerns the testimony of Dawna Don Carlos, who testified about collecting hair and debris from paper bags which were placed over Creek's hands at the scene. The defense cross-examined the witness about what kind of debris and how many hairs were collected from the bags. When the witness referred to her notes, the defendant's counsel stated, "Could I take a peek at those notes because I don't think I have ever had a chance to look at those."

On appeal, the defendant claims that evidence was not made available to him until trial. The defendant suggests that had he received reports of the blood tests prior to the hearing, his trial strategy would have differed. He reasons that not having these reports ahead of the hearing impaired his ability to examine each of the witnesses testifying regarding this evidence and that his defense was prejudiced by the delayed disclosure of evidence.

The testimony of both witnesses concerned the collection of blood, hair, and debris samples, not the tests conducted with the blood or hair. The defendant provides no details about what "reports" were not made available to him before trial. The defendant has not shown what, if any, evidence was withheld by the State, nor has he shown that the evidence was clearly exculpatory. Under these circumstances, the defendant is not entitled to reversal of a conviction based on the State's failure to disclose unspecified reports.

The defendant also states, "[T]estimony from Sutton regarding the Defendant's intoxication was not disclosed to this jury although statements of an incriminating nature were disclosed." The defendant did not attempt to have any statements of Sutton concerning

the defendant's intoxication admitted into evidence. Defendant provides no cite to the record where such testimony was excluded. Additionally, there is no record that Sutton in fact made any statement concerning the defendant's intoxication. The record on appeal does not show that this information was withheld or suppressed by the prosecution; indeed, it does not show that such evidence even exists. The defendant is not entitled to reversal of his convictions based on evidence of his intoxication allegedly withheld by the prosecution and excluded at trial where there is no cite to the record showing exclusion of such evidence.

Finally, the defendant argues that the State failed to disclose evidence of $30 found in Creek's sock during the autopsy. The defendant again fails to cite to the record concerning this evidence. Without providing a record, the defendant argues that the $30 may have been some of the money withdrawn from Creek's account through the ATM machine. From this, he concludes that there may have been no robbery at all. Defendant's argument ignores that items taken from Creek included his truck and other belongings in addition to the money from his bank account. It also ignores that $90, not $30, was withdrawn from Creek's bank account. Evidence of $30 found in Creek's sock is not clearly exculpatory. The defendant is not entitled to reversal of his convictions based on the State's alleged failure to disclose the $30 found in Creek's sock during the autopsy.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant asserts that he had ineffective assistance of counsel at trial. The issue of ineffective assistance of counsel is raised for the first time on appeal.

An allegation of ineffective assistance of counsel will not be considered for the first time on appeal. The principal problem facing an appellate court reviewing a claim of ineffective assistance of counsel raised for the first time on appeal is that the trial court, which observed counsel's performance and was aware of the trial strategy involved, is in a much better position to consider counsel's competence than an appellate court is in reviewing the issue from a cold record. Many times what would appear in the record as

indicative of ineffective counsel was fully justified under the circumstances present in the trial court. The trial judge should be the first to make a determination of such an issue, and our refusal to consider the matter for the first time on appeal is sound. *State v. Van Cleave*, 239 Kan. 117, 119, 716 P.2d 580 (1986).

The *Van Cleave* court recognized two remedies where an ineffective assistance of counsel claim arises for the first time on appeal. One remedy is via K.S.A. 60-1507. The other option, where new counsel enters the case after the appeal is filed, is for the defendant to seek a remand from the appellate court to the trial court for determination of that issue. *Van Cleave*, 239 Kan. at 119-20.

The defendant did not seek a remand to the trial court, which had observed trial counsel's actions, to determine the ineffective assistance of trial counsel issue. There is also no evidence that defendant's appellate counsel conducted an independent inquiry or investigation other than to read the cold record and determine that he would have handled the trial differently. The defendant has not properly perfected an appeal on this issue.

In any event, much of appellate counsel's complaints of trial counsel's assistance concern points which were not disputed at trial. The theory of defense at trial was that the defendant was improperly identified as being involved in the crimes with Frank Sutton; rather, according to the theory of defense, another individual was involved, such as John McGill, Dan Deenihan, or Randy Drown. The defendant's trial counsel appears to have done an adequate job of casting suspicion on others. A cold reading of the record does not overcome the presumption that trial counsel met an objective standard of reasonableness, nor does it reveal a reasonable probability that the outcome of the trial would have been different. The defendant has not shown that his trial counsel's conduct was deficient and that he was prejudiced by this deficiency.

## DOUBLE JEOPARDY

The defendant next contends that his sentences for both felony murder and the underlying felonies are multiple punishments for

the same offense and therefore violate his constitutional protection against double jeopardy.

This same argument was decided adversely to the defendant's position in the appeal of his codefendant, Frank Sutton, where this court held that "[a] defendant's convictions and subsequent imposition of consecutive sentences for felony murder and the underlying felonies of aggravated kidnapping and aggravated robbery do not violate the prohibition against double jeopardy." *Sutton*, 256 Kan. 913, Syl. ¶ 1; see *State v. Gonzales*, 245 Kan. 691, 707, 783 P.2d 1239 (1989); *State v. Dunn*, 243 Kan. 414, 432-33, 758 P.2d 718 (1988). The defendant makes no arguments not considered and rejected by this court in *Sutton*, *Gonzales*, and *Dunn*, and his claim is without merit.

## FAILURE TO GIVE AN ACCOMPLICE INSTRUCTION

The defendant argues that the trial court should have given the jury an instruction on accomplice testimony. Because the defendant did not request such an instruction, our standard of review is whether the failure to give the instruction was clearly erroneous. See *Whitaker*, 255 Kan. at 125.

The defendant acknowledges this court's standard of review but asserts that an accomplice instruction is proper in all circumstances where an accomplice testifies or an accomplice's statement is admitted into evidence. He asserts that the instruction was necessary because the evidence that convicted him was all circumstantial and there were no witnesses to the crime. Therefore, the defendant argues, there was a real possibility the jury would have reached a different verdict if it had been given an instruction on accomplice testimony.

The State points out that Sutton did not testify at the defendant's trial. The State asserts the rationale for giving an accomplice instruction is that an accomplice witness, when testifying as a witness for the prosecution, will diminish his or her own culpability and shift responsibility for the crimes to the defendant. The State concludes that when the accomplice does not testify in court and the accomplice's out-of-court statements are admitted because the defendant's cross-examination opened the door to the admission of

that evidence, the rationale for giving an accomplice instruction is not satisfied. We agree. Under the circumstances of this case, although Sutton's out-of-court statements were admitted, giving an accomplice instruction was not required.

## VIOLATION OF THE WITNESS SEQUESTRATION RULE

Defendant contends that contact between a witness and the KBI was a violation of the witness sequestration order and warranted a mistrial. The trial court may order a mistrial if such is necessary because "[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." K.S.A. 22-3423(1)(c). The granting of a mistrial is a matter which lies within the sound discretion of the trial court, and the trial court's determination will not be disturbed absent an abuse of that discretion. *State v. Cahill*, 252 Kan. 309, 314, 845 P.2d 624 (1993).

John McGill testified that he and Dan Deenihan were working at LaSiesta Foods on the night of March 4. McGill stated that he got off work in the early morning hours of March 5, around 2:15. On cross-examination, McGill was confronted with a time sheet showing that he clocked out at 10:48 p.m. on March 4. Following McGill's testimony, Dan Deenihan testified that he got off work between 10:00 and 11:00 p.m. on March 4 even though he usually got off work between 2:00 and 3:00 a.m. He admitted that he previously told investigators that he got off work around 2:00 a.m. on the 5th. Deenihan testified that he was told by a KBI agent the morning before he was to testify that his work records showed he got off work earlier than he had initially thought. The defendant moved for a mistrial, arguing that because the KBI spoke with Deenihan before his testimony, there was a violation of the witness sequestration order.

When requested by a defendant, K.S.A. 22-2903 requires the sequestration of witnesses during preliminary hearings. At trial, sequestration is not a right but rests within the sound discretion of the trial court. In the absence of any showing of prejudice to the defendant, the trial court's decision will not be reversed on appeal. *State v. Dunn*, 243 Kan. 414, 428, 758 P.2d 718 (1988). In addition,

a violation of a court order sequestering witnesses does not automatically disqualify a witness from testifying in the absence of any showing of prejudice to the defendant, and the trial court may in its discretion permit the witness to testify despite the violation. See *State v. Ransom*, 239 Kan. 594, 600, 722 P.2d 540 (1986); *State v. Cantrell*, 234 Kan. 426, Syl. ¶ 3, 673 P.2d 1147 (1983), *cert. denied* 469 U.S. 817 (1984).

The State asserted that the KBI was investigating as to when Deenihan and McGill got off work at the prosecution's request. The State reasoned that there can be no bad faith when investigations continue during the trial because new issues arise. The trial court noted that the sequestration rule is intended to keep witnesses from discussing their testimony with each other, not to prevent counsel or investigative authorities from continuing their investigation. The court found that there was no violation of the sequestration rule and denied the motion for mistrial.

We agree that there was no violation of the sequestration rule. Both parties must be permitted to continue investigating their cases throughout the trial. The State informed the trial court and the defendant early on during trial that it was continuing to investigate at LaSiesta Foods in anticipation of rebuttal evidence. This was not a case of two witnesses discussing their testimony. The KBI investigator spoke with a witness as to conflicting evidence at the request of the prosecution. The defendant has not shown that there was a violation of a sequestration order or that he was prejudiced by Deenihan's testimony. The trial court did not abuse its discretion by denying the defendant's motion for a mistrial.

Affirmed.